UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
COMPREHENSIVE HABILITATION            :
SERVICES, INC.,
                                      :
         Plaintiff,           _____05 Civ. 9640 (PKL) (GWG)

    -v.-                              :    **OPINION AND ORDER**

COMMERCE FUNDING CORPORATION,         :

         Defendant.                   :
------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**


APPEARANCES OF COUNSEL:


John W. Clarke
Alfred J. Sargente
Harris Beach PLLC
805 Third Avenue
New York, NY 10022
Attorneys for Plaintiff

Ronald B. Goodman
Robinson Brog Leinwand Greene
Genovese & Gluck P.C.
1345 Avenue of the Americas
New York, NY 10105
Attorney for Defendant

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
COMPREHENSIVE HABILITATION           :
SERVICES, INC.,
                                     :
        Plaintiff,                        05 Civ. 9640 (PKL) (GWG)

   -v.-                              :   **OPINION AND ORDER**

COMMERCE FUNDING CORPORATION,        :

        Defendant.                   :
-----------------------------------------------------------X
```

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Defendant Commerce Funding Corporation ("CFC") has moved to compel plaintiff Comprehensive Habilitation Services, Inc. ("CHS") to disclose its correspondence and the substance of its conversations with the Internal Revenue Service ("IRS") and the Department of Justice ("DOJ"). CFC also seeks to compel CHS's principal to testify regarding certain purportedly attorney-client privileged matters on the ground that the privilege has been waived. For the reasons stated below, CFC's motion is granted. Its request for sanctions, however, is denied.

I. BACKGROUND

   A. The First and Second Actions

CHS supplies administrative and consultation services to health care providers. See Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc., 2005 WL 1026515, at *1 (S.D.N.Y. 2005). In 1997, CHS entered into a factoring agreement with CFC pursuant to which CFC purchased CHS's accounts receivable. Plaintiff's Complaint, filed Nov. 15, 2005 (Docket #1) ("Compl."), ¶¶ 5-6. In 1999, CHS sued one of the obligors of the accounts receivable, Barnert Hospital ("Barnert"). See Comprehensive Habilitation Servs., Inc. v. Barnert Hosp., No.

99-cv-680 (D.N.J. filed Feb. 17, 1999) (the "First Action"); Compl. ¶ 11.

CFC then brought suit against CHS and six obligors of the accounts receivable, including Barnert, alleging that they had defaulted on obligations to CFC.  See Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc., No. 01-Civ.-3796 (S.D.N.Y. filed May 3, 2001) (the "Second Action"); Compl. ¶ 9.  Several months later, Barnert entered into an agreement that settled the First Action in its entirety and also settled the claims against Barnert in the Second Action.  See Settlement Agreement, filed November 1, 2001, in 01 Civ. 3796 (PKL) ("Barnert Settlement"), ¶¶ 2-6; Compl. ¶ 14.  The settlement is reflected in a "so ordered" agreement that was signed by CHS, Dr. Peter Magaro (CHS's President), Barnert and CFC.  See Barnert Settlement.  The Barnert Settlement required Barnert to pay $500,000 into an escrow account.  See id. at ¶¶ 1(a)-(b), (d).  The agreement directs that, once the funds are in the hands of the escrow agent, the agent shall disburse the funds to "CHS or holder(s) of any security interest(s) granted by CHS in and to its receivables and/or accounts, in such manner and such amounts as will comply with the legal obligations of CHS or to [CFC] and not expose Barnert to any claim . . . ."  Id. ¶ 7(d).  It appears from other language in the document that the "legal obligation" being referred to is any legal obligation that would be adjudicated as a result of the Second Action, see id. ¶¶ 7(b), (c) – presumably an obligation that would run between CFC and CHS.

Almost a year later, an agreement was prepared that purported to resolve part of the Second Action: specifically, claims among CFC, CHS, and Saint Vincent's Hospital and Medical Center ("St. Vincent's"), another of the six obligors sued in that action (the "First Settlement").  See Compl. ¶¶ 19-20.  The parties disagree, however, as to whether this agreement was ever in effect.  Compare Compl. ¶ 21 with Defendant's Memorandum of Law, filed July 7, 2006

(Docket #15) ("Def. Mem."), at 2.  The parties allege that this agreement bore a date of October 22, 2002, see Compl. ¶ 20; Defendant's Answer, filed Jan. 11, 2006 (Docket #6) ("Answer"), ¶ 20, though no copy has been provided to this Court.  In any event, CHS alleges that on October 28, 2002, in reliance on this purported agreement, it directed that the escrow agent release the Barnert Settlement funds to CFC.  See Compl. ¶ 32.

On November 7, 2002, St. Vincent's informed CHS that St. Vincent's had been served with a notice of levy from the IRS, dated August 6, 2002, to collect taxes allegedly owed by CHS.  Compl. ¶ 22; Affidavit of Ronald B. Goodman, filed July 7, 2006 (Docket #14) ("Goodman Aff."), ¶ 8.  St. Vincent's apparently would not execute the First Settlement until the tax levy was resolved.  See Affidavit of John W. Clarke in Opposition to Defendant's Motion, filed Aug. 22, 2006 (Docket #16) ("Clarke Aff."), ¶ 5; Goodman Aff. ¶ 8.

A new settlement agreement (the "Second Settlement") was prepared in December 2002 between CFC, St. Vincent's, and Better Medical Services, Inc. ("BMS"), a guarantor of CHS's debt.  See Compl. ¶ 28; Answer ¶ 28.  CHS was at that time engaged in negotiations with the IRS to resolve its tax obligations.  See Compl. ¶¶ 24-26.  CHS alleges that "[o]n or about December 19, 2002," its attorneys advised CFC and St. Vincent's "by telephone message that the IRS matter had been resolved," Compl. ¶ 26 – an assertion disputed by CFC.  See Answer ¶ 26.  Nonetheless, the Second Settlement – without CHS as a party – was executed on or about December 20, 2002.  Goodman Aff. ¶ 11.  That agreement allegedly provided that St. Vincent's would pay CFC $1,455,500.  See Answer ¶ 97.

3

In a letter to CFC dated December 27, 2002, CHS confirmed that it had resolved its dispute with the IRS.[1]  See Goodman Aff., Ex. C; see also Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Compel Production of Documents, filed Aug. 8, 2006 (Docket #17) ("Pl. Mem."), at 3.

    B.  The Instant Case

CHS alleges that it permitted release of the Barnert Settlement funds to CFC only because CHS was relying on the purported execution of the First Settlement.  See Compl. ¶ 32.  CHS asserts that CFC has wrongfully held those funds, which amount to more than $500,000.  See id. at ¶¶ 37-38.  CHS alleges the following claims in this case: that when CFC retained the funds but did not execute the settlement, it wrongfully converted those funds, see id. at ¶¶ 47-51; that in doing so, CFC intentionally and fraudulently misled CHS and induced reliance, thus damaging CHS in the amount of those funds, see id. at ¶¶ 53-56; and that CFC was thereby unjustly enriched.  See id. at ¶¶ 58-60.  In addition, CHS alleges that CFC breached their factoring agreements by failing to remit all funds paid to CFC (minus fees and monies advanced by CFC to CHS).  See id. at ¶¶ 62-64.  Finally, CHS alleges that CFC breached the covenants of good faith and fair dealing implied in their factoring agreements and the Barnert Settlement.  See id. at ¶¶ 66-68.

---

[1] The plaintiff's complaint indicates that this letter is dated December 27, 2004.  See Compl. ¶ 26.  The letter, however, appears to be dated December 27, 2002.  See Goodman Aff., Ex. C.  This Court will assume it was sent in 2002, as did the court in the Second Action.  See Commerce Funding Corp. v. Comprehensive Habilitation Services, Inc., 233 F.R.D. 355, 359 n.2 (S.D.N.Y. 2005).

II. DISCUSSION

CFC requests that this Court compel plaintiff CHS to disclose its communications with the IRS, see Def. Mem. at 1, some of which have already been "inadvertently" disclosed. See Clarke Aff. ¶ 11.[2] CFC seeks not only correspondence between CHS and the IRS, but also deposition testimony regarding any discussions they had. See Def. Mem. at 1-2.

In addition, CFC issued a subpoena to the IRS seeking deposition testimony and production of documents relating to CHS. See Goodman Aff., Ex. G. Because the IRS responded to that subpoena by asserting that 26 U.S.C. § 6103 bars it from complying without authorization from CHS, see Goodman Aff., Ex. H, CFC asks that this Court compel CHS to "waive" its § 6103 rights, see Def. Mem. at 10-12, which this Court interprets as a request that the Court order CHS to provide authorization to the IRS for release of the information.

Finally, CFC seeks to compel one of CHS's principals, Peter Magaro, to testify regarding certain purportedly attorney-client privileged matters on the ground that the privilege was waived during his deposition. Def. Mem. at 6-7.

We now discuss each of CHS's objections to CFC's motion.

A. Relevance

CFC argues that the information sought is not relevant. See Pl. Mem. at 2-3. CFC's argument on relevance requires some background on the history of the settlement negotiations. As noted, St. Vincent's refused to execute the First Settlement because of the IRS levy on CHS's funds. Compl. ¶ 22; Goodman Aff. ¶ 8; Clarke Aff. ¶ 5. CHS contends that it then negotiated

---

[2]CFC also seeks documents reflecting communications with the DOJ; but since the DOJ acted as the IRS's attorney, we will refer to both parties collectively as the IRS.

5

with the IRS to resolve the lien. Compl. ¶ 24. CFC asserts that, after "[a] month passed without resolution" of the lien, CFC felt that their settlement with CHS and St. Vincent's "appeared aborted." Goodman Aff. ¶ 9. Accordingly, in December 2002, CFC, St. Vincent's, and BMS negotiated the Second Settlement and it "was executed on or around December 20, 2002." Goodman Aff. ¶ 11.

CHS has alleged that, one day prior to the execution of the Second Settlement, or December 19, 2002, "attorneys for CHS advised the attorneys for CFC and St. Vincent by telephone message that the IRS matter had been resolved . . . ." Compl. ¶ 26. CFC denies having received the December 19th telephone message. Answer ¶ 26. In addition, CFC has some evidence that in fact there was no resolution of the lien inasmuch as the DOJ wrote a letter to CHS, also dated December 19, 2002, in which it states that "the Government declines [CHS's] offer to settle." Goodman Aff., Ex. B.

CFC characterizes the resolution of the lien as "a required pre-condition for execution of the" First Settlement. Goodman Aff. at ¶ 15. As a result, CFC seeks discovery "concerning communications about that tax levy and its supposed resolution . . . ." Def. Mem. at 2. In response, CHS explains that its claim "is that [CFC] wrongfully retained funds designated to be released to [CHS] pursuant to the terms of the settlement agreement which was aborted by [CFC]." Pl. Mem. at 3. Based on this assertion, CHS argues that its negotiations with the IRS to resolve its tax levy are not relevant. Id.

Under the Federal Rules of Civil Procedure, a party may discover any non-privileged information "that is relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b)(1). The evidence "need not be admissible at the trial if the discovery appears reasonably calculated to

6

lead to the discovery of admissible evidence." Id. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. To meet the standard of relevance, the discovery request need only "encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978). While discovery is not boundless, a court should interpret the concept of relevance "broadly." In re Flag Telecom Holdings, Ltd. Sec. Litig., 236 F.R.D. 177, 183 (S.D.N.Y. 2006) (citing cases).

At this stage of the litigation, the Court cannot say that the communications between the IRS and CHS fail to satisfy this expansive definition. CHS alleges that CFC's failure to abide by the First Settlement amounted to, inter alia conversion and fraud, and that CFC was unjustly enriched. See id. ¶¶ 47-60. CHS obviously views its settlement discussions with the IRS as relevant to its claims since it included in its complaint allegations regarding the fact that the lien was purportedly resolved. See Compl. ¶¶ 22-27. Moreover, CFC seeks to defend itself by asserting that the existence of the tax levy was a legitimate excuse for its refusal to comply with the terms of the First Settlement and that it thus cannot be held liable for failure to honor this purported agreement. Answer ¶¶ 93; Defendant's Reply Memorandum of Law, filed Aug. 22, 2006 (Docket #18) ("Reply"), at 3-4. At a minimum, discovery into whether CHS had in fact resolved the levy issue with the IRS would potentially have bearing on whether CHS can show that the parties' conduct is such that "equity and good conscience," Korff v. Corbett, 18 A.D.3d 248, 251 (1st Dep't 2005), require that CHS recover on its unjust enrichment claim.

Accordingly, the information sought is within the scope of Rule 26(b)(1).

B.      26 U.S.C.§ 6103

It does not appear that CHS relies on section 6103 to object to disclosure of its own information relating to the tax levy.  Nor could it inasmuch as section 6103 places no restrictions on the disclosure by a taxpayer of its own information.  Rather, section 6103 states that "[r]eturns and return information shall be confidential, and . . . no officer or employee of the United States . . . shall disclose any return or return information obtained . . . ." 26 U.S.C. § 6103(a)(1) (emphasis added).  Thus, the statute bars only the Government, not individual taxpayers, from disclosing return information.  Any argument to the contrary has been characterized as "border[ing] on the frivolous." Richards v. Stephens, 118 F.R.D. 338, 339 (S.D.N.Y. 1988).

Instead, CHS argues that it should not be required to produce "sensitive financial information." Pl. Mem. at 5.  But other than its citation to section 6103 and some irrelevant case law relating to that section, CHS does not explain on what basis this Court should excuse it from providing such information.

While CHS does not cite it, there is in fact a body of case law that requires a heightened showing where the production of tax returns and related information is concerned.  See, e.g., Trudeau v. New York State Consumer Prot. Bd., 237 F.R.D. 325, 331-32 (N.D.N.Y. 2006) (citing cases); Campinas Found. v. Simoni, 2005 WL 1006511, at *5 (S.D.N.Y. Apr. 27, 2005); S.E.C. v. Cymaticolor Corp., 106 F.R.D. 545, 547 (S.D.N.Y. 1985).  Under this standard, production of tax information is warranted only where a court finds "[(1)] that the requested tax information is relevant to the subject matter of the action; and (2) that there is a compelling need for this information because the information contained therein is not otherwise readily

obtainable." Trudeau, 237 F.R.D. at 331 (citing cases). Given CHS's failure to advert to this standard, the Court is reluctant even to consider its applicability in this case.

Nonetheless, CFC has shown the relevance of the information. In such circumstances, CHS has the burden of showing the existence of alternative sources for the information. See, e;g., United States v. Bonanno Organized Crime Family of La Cosa Nostra, 119 F.R.D. 625, 627 (E.D.N.Y. 1988). CHS has made no such showing here. Thus, any heightened standard applied to tax return information would not bar disclosure.

CFC also seeks to require CHS to provide a document to the IRS that affirmatively waives section 6103 confidentiality. See Def. Mem. at 10-12. Other than its argument that the information is sensitive and not relevant, CHS provides no argument at all that it should not be required to provide a release to the IRS for this information. Where a party has placed a particular factual matter at issue, courts routinely require that party to execute whatever releases may be necessary for the opposing party to obtain relevant non-privileged information regarding that factual matter. Where a plaintiff refuses to execute the release, the court will typically sanction the plaintiff through an order of preclusion or dismissal. See, e.g., Hyer v. City of New York, 2006 WL 2053195, at *1 (S.D.N.Y. July 21, 2006) (case dismissed where plaintiffs in false arrest failed to execute document authorizing release of criminal records). The same principle applies to tax records. See, e.g., Burrell v. AT&T, 2006 WL 1997712, *1 (S.D.N.Y. July 18, 2006) ("If plaintiff does not deliver an original release for his tax records and the remaining damages documents to defendants' counsel by 5:00 p.m. on July 18, 2006, we will entertain a prompt application by defendants to preclude plaintiff from offering any evidence at trial as to damages."). Accordingly, CHS should provide the release promptly. If it fails to do

9

so, CFC has leave to seek an appropriate sanction: either preclusion of evidence or dismissal of CHS's claims.[3]

### C. Attorney-Client Privilege

CHS argues that its negotiations with the IRS and documents exchanged between them are protected by the attorney-client privilege. See Pl. Mem. at 6-7. This argument is frivolous.

#### 1. Choice of Law

This Court's subject matter jurisdiction is based upon diversity. See Compl. ¶ 3. Accordingly, state law provides the rule of decision concerning the claim of attorney-client privilege. See Fed. R. Evid. 501; Dixon v. 80 Pine St. Corp., 516 F.2d 1278, 1280 (2d Cir. 1975). The parties' briefing does not address the choice-of-law issue and instead simply cites to cases applying the attorney-client privilege under New York law. As such, the parties have implicitly consented to having New York privilege law apply and this "'implied consent . . . is sufficient to establish choice of law.'" Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (quoting Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989)).

#### 2. Applicability of the Privilege

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981) (citation omitted). In New York, the statutory codification of the privilege is as follows:

---

[3]CHS has not addressed the scope of the requested release or of CFC's subpoena to the IRS. Nonetheless, the Court notes that the subpoena to the IRS appears to be overbroad insofar as it seeks some items that pertain to CHS generally. See Goodman Aff. Ex. G at 5. Other requests, by contrast, are appropriately tailored to request documents pertaining to the lien or levy.

> [A]n attorney or his or her employee, or any person who obtains without the knowledge of the client evidence of a confidential communication made between the attorney or his or her employee and the client in the course of professional employment, shall not disclose, or be allowed to disclose such communication, nor shall the client be compelled to disclose such communication . . . .

N.Y. C.P.L.R. 4503(a)(1).

CHS's argument as to why the attorney-client privilege applies here is difficult to discern. CHS apparently understands that the IRS was not acting as its attorney. Rather, it argues that because the IRS "is in a confidential relationship with respect to taxpayers," the attorney-client privilege should apply. Def. Mem. at 7. In support of this argument, CHS cites to dictum in a single case from over 70 years ago. See Lawless v. Schoenaker, 147 Misc. 626 (N.Y. App. Term, 2d Dep't 1933). Lawless, however, is irrelevant because it held that a third party's presence at a client's meeting with his lawyer defeated the attorney-client privilege. Id. at 629. Its dictum merely posited the potential that the presence of someone in a "peculiar relation of confidence to the client," id. at 627, might not defeat the privilege.

Even the dictum is irrelevant. First, there is no claim that CHS waived its attorney-client privilege because of the presence of the IRS during a privileged communication. Rather, there was no privileged communication at which the IRS was present. Second, even if CHS had had such a communication with its attorney with the IRS present, CHS points to no case where a potential adversary present during such a communication – such as the IRS was to CHS here – could possibly be viewed as occupying a "peculiar relation of confidence to the client."

### D. Work Product Doctrine

CHS also seeks to protect its correspondence with the IRS from disclosure under the work product doctrine. Pl. Mem. at 7-8. The work product doctrine protects material "prepared

in anticipation of litigation or for trial by or for another party or by or for that other party's representative." See Fed. R. Civ. P. 26(b)(3). The doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye towards litigation,' free from unnecessary intrusion by his adversaries." United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting Hickman v. Taylor, 329 U.S. 495, 510-11 (1947)). However, any protection that is afforded by the work product doctrine may be waived, see United States v. Nobles, 422 U.S. 225, 239 (1975), and the party claiming protection has the burden of establishing that the protection has not been waived. See, e.g., von Bulow v. von Bulow, 811 F.2d 136, 144 (2d Cir. 1987), cert. denied, 481 U.S. 1015 (1987); Granite Partners v. Bear, Stearns & Co., 184 F.R.D. 49, 52 (S.D.N.Y. 1999).

  Putting aside the question of whether correspondence between CHS's attorney and the IRS was prepared in anticipation of litigation, any protection afforded by the work product doctrine was waived by the disclosure to the IRS. Work product exists "to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of the opponent." United States v. Am. Tel. and Tel. Co., 642 F.2d 1285, 1299 (D.C. Cir. 1980) ("AT&T") (citation omitted); accord In re Visa Check/MasterMoney Antitrust Litig., 190 F.R.D. 309, 314 (E.D.N.Y. 2000) (purpose of work product doctrine is "to keep counsel's work from his opponent in the litigation so that it will not be used against him"). Thus, the protection is unavailable when the disclosure is made in a manner that is "inconsistent with maintaining secrecy against opponents." AT&T, 642 F.2d at 1299. As a result, "[o]nce a party allows an adversary to share the otherwise privileged thought processes of counsel, the need for the privilege disappears." In re Steinhardt Partners, L.P., 9 F.3d 230, 235 (2d Cir. 1993).

In sum, a "voluntary disclosure of work product to an adversary waives the privilege as to other parties." Id. (citations omitted). Here CHS's negotiations and correspondence with its adversary, the IRS, waived any purported work product protection.

E. Attorney-Client Privilege Waiver Motion

In addition to its requests relating to tax information, CFC also seeks a ruling that CHS waived its attorney-client privilege with respect to its "counsel's legal advice regarding the arbitrators' conclusions of fact and law." Def. Mem. at 14. Specifically, after CHS's President, Dr. Magaro, was deposed by CFC, CHS's counsel, John W. Clarke, Esq., cross-examined Dr. Magaro. In a series of three questions, Mr. Clarke asked Dr. Magaro about the substance of their discussion – that is, the discussion between Mr. Clarke and Dr. Magaro – regarding the arbitration panel's decision in the Second Action. See Goodman Aff., Ex. I.

CFC makes two arguments in support of its "waiver" claim. First, it argues that the "legal advice regarding the arbitrators' findings and conclusions with respect to CFC's actions is directly in issue and the attorney-client privilege should be waived accordingly." Def. Mem. at 13. Second, it argues that CFC has "selectively reveal[ed] the contents of probative communications with its attorney" and thus must be required to disclose all these communications. Id.

The first argument is easily dealt with. While a party waives the attorney-client privilege when the party places otherwise privileged communications "at issue" in the litigation, see, e.g., In re von Bulow, 828 F.2d 94, 102 (2d Cir. 1987), CFC has not offered a coherent explanation of why such a waiver occurred here. It states only that communications between CHS and its attorney were put at issue when CHS "claim[ed] herein that defendant acted in a manner which a

13

legal authority should interpret as 'improper,'" Def. Mem. at 13 – presumably a reference not to the deposition testimony, but to the claims made in the complaint. But proof that CFC acted improperly does not require CHS to rely on communications with its attorney. Nor does defense of such a claim by CFC require testimony from CHS's counsel. In other words, CHS's attorney's legal advice regarding CFC's actions is irrelevant to the question of whether CFC's actions were "improper" or not. Thus, CHS has not put its communications with counsel "at issue."

The second argument – based on the testimony by Dr. Magaro at the deposition regarding his conversation with counsel – is more significant. At the deposition, Dr. Magaro was asked about and testified to communications between him and Mr. Clarke regarding what issues the arbitration panel had considered. See Goodman Aff., Ex. I. It is well-settled that "a party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party." In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000). Thus, "the client's offer of his own or the attorney's testimony as to a specific communication to the attorney is . . . a waiver as to all other communications to the attorney on the same matter." Exp.-Imp. Bank of the United States v. Asia Pulp & Paper Co., Ltd., 232 F.R.D. 103, 114 (S.D.N.Y. 2005) (citations omitted). Still, "[b]ecause notions of fairness underlie the principle of subject matter waiver, courts make determinations on a case-by-case basis, taking into account, among other things, whether a party's disclosure was demonstrably prejudicial to the other party." Id. (internal punctuation and citations omitted).

In its papers filed in opposition to the instant motion, CHS offers no argument whatsoever to counter CFC's argument that the deposition testimony constituted a waiver of attorney-client privileged communications. It does not argue that the communications between Mr. Clarke and Dr. Magaro were not privileged. It does not argue that the deposition testimony regarding these conversations did not effectuate a waiver. Nor does it argue that, even if these conditions obtain, fairness requires that the communications not be revealed.

Inasmuch as the burden of showing the applicability of the attorney-client privilege rests with the party asserting it, see, e.g., United States v. Int'l Bhd. of Teamsters, 119 F.3d 210, 214 (2d Cir. 1997), the Court will conclude that there has been a waiver. The waiver will be limited, however, to the subject matter of the disclosure: that is, the particular subject matter raised by Dr. Magaro's answers to the deposition questions. Thus, CFC shall be entitled to obtain discovery with respect to any communications between Mr. Clark and CHS regarding the issues that the attorney believed were resolved in the arbitration panel's decision.

F. Attorney's Fees

CFC requests that the Court award expenses and attorney's fees incurred in this motion to compel. The law provides that if a court grants a motion to compel disclosure or discovery, "the court shall . . . require the party or deponent whose conduct necessitated the motion . . . to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds . . . that the opposing party's nondisclosure, response, or objection was substantially justified . . . ." Fed. R. Civ. P. 37(a)(4)(A). One court has held that "[w]hen a dispute involves differing interpretations of the governing law, opposition is substantially justified unless it involves an unreasonable, frivolous or completely unsupportable reading of the

15

law." <u>Bowne of New York City, Inc. v. AmBase Corp.</u>, 161 F.R.D. 258, 265 (S.D.N.Y. 1995). While some of CHS's arguments in this case were frivolous – such as those asserting that its communications with the IRS were protected by the attorney-client privilege – there was some justification overall to support CHS's resistance of the discovery requests: specifically, its argument as to relevance. Because that argument – although not persuasive – could be characterized as a justification having "substan[ce]," an award of attorney's fees is not warranted.

## Conclusion

The motion to compel (Docket #13) is granted. The motion for attorney's fees is denied.

SO ORDERED.

Dated: October 23, 2006
      New York, New York

                                                            _____
                                                            GABRIEL W. GORENSTEIN
                                                            United States Magistrate Judge

law." Bowne of New York City, Inc. v. AmBase Corp., 161 F.R.D. 258, 265 (S.D.N.Y. 1995). While some of CHS's arguments in this case were frivolous – such as those asserting that its communications with the IRS were protected by the attorney-client privilege – there was some justification overall to support CHS's resistance of the discovery requests: specifically, its argument as to relevance. Because that argument – although not persuasive – could be characterized as a justification having "substan[ce]," an award of attorney's fees is not warranted.

## Conclusion

The motion to compel (Docket #13) is granted. The motion for attorney's fees is denied.

SO ORDERED.

Dated: October 23, 2006
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge