UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMPREHENSIVE HABILITATION
SERVICES, INC.,

        Plaintiff,

       - against -

COMMERCE FUNDING CORPORATION,

        Defendant.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  4 | 7 | 09
```

**OPINION AND ORDER**

05 Civ. 9640 (PKL)

**Appearances**

HARRIS BEACH PLLC
John W. Clarke, Esq.
100 Wall Street
New York, NY 10005

Attorneys for Plaintiff

ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.
Ronald B. Goodman, Esq.
1345 Avenue of the Americas
New York, NY 10105

Attorneys for Defendant

**LEISURE, District Judge:**

In this diversity case, plaintiff Comprehensive Habilitation Services, Inc. ("CHS") brings suit against defendant Commerce Funding Corporation ("CFC") for breach of contract, breach of the implied covenant of good faith and fair dealing, conversion, fraud, and unjust enrichment.  CFC has moved for summary judgment, principally contending that there is no genuine issue of material fact regarding its entitlement to all funds collected from CHS, and that CHS's claims should be dismissed as a matter of law.  For the reasons set forth below, CFC's motion for summary judgment is GRANTED in part and DENIED in part.

## Background

The following overview is derived from the statements of material facts, affidavits, and exhibits of the parties, and unless otherwise noted, shall constitute the facts not in dispute.  The facts are construed in the light most favorable to plaintiff, the non-moving party.  See, e.g., In re "Agent Orange" Prod. Liab. Litig., 517 F.3d 76, 87 (2d Cir. 2008).

1

## I.    **The Factoring Agreement**

This litigation stems from CHS's agreement to factor[1]

accounts receivable with CFC. (Def.'s 56.1 ¶ 1.)[2] Specifically,

on or about December 12, 1997, CHS and CFC entered into a Fee

Agreement, and on or about December 19, 1997, CHS and CFC also

entered into an Assignment and Transfer of Receivables

Agreement, as amended on January 29, 1999 and August 13, 1999

(the "Assignment"). (Clarke Aff. ¶ 4; Def.'s Exs. 1-2; Pl.'s

Exs. A-C.)  Under these agreements, CFC, as lender, contracted

---

[1] Factoring is a type of accounts receivable financing.  Typically, a factor
purchases accounts receivable at a discount from the invoice amount, and
advances funds or credit to the seller against the accounts receivable, which
are assigned to the factor. 32 Am. Jur. 2d § 2.  In return for the right to
collect on the accounts receivable and for the discounted purchase price, the
factor typically assumes the risk of loss in the event that the account
debtors are unable to pay. Id.  However, the factor may retain a security
interest in the seller's other property, including nonfactored accounts
receivable. See id.  "As owner of the account, the factor is typically
entitled to receive payment directly from the account debtor, and to
undertake collection activities." Dessert Beauty, Inc. v. Platinum Funding
Corp., 519 F. Supp. 2d 410, 414 (S.D.N.Y. 2007) (citing Woelfel, Charles J.,
Encyclopedia of Banking & Finance, at 370 (10th ed. 1994)).

[2] For ease of reference, where facts are undisputed, the Court cites only to
Defendant's Statement of Material Facts Pursuant to Local Civil Rule 56.1,
hereafter referred to as "Def.'s 56.1."  Citations to "Pl.'s 56.1" refer to
Plaintiff's Response to Defendant's Statement of Material Facts Pursuant to
Local Civil Rule 56.1. Citations to "Def.'s Reply 56.1" refer to Defendant's
Response to Plaintiff's Statement of Material Facts Pursuant to Local Civil
Rule 56.1.  Citations to "Goodman Aff." refer to the Affidavit of Ronald B.
Goodman, Esq., sworn to on April 20, 2007, while citations to "Goodman Reply
Aff." refer to the Reply Affidavit of Ronald B. Goodman, Esq., sworn to on
June 27, 2007.  Citations to "Clarke Aff." refer to the Affidavit of John W.
Clarke, Esq. in Opposition to Defendant's Motion for Summary Judgment, sworn
to on June 7, 2007.  Citations to "Def.'s Mem." refer to the Memorandum of
Law In Support of Defendant's Motion for Summary Judgment.  Citations to
"Pl.'s Mem." refer to Plaintiff's Memorandum of Law in Opposition to
Defendant's Motion for Summary Judgment.  Citations to "Def.'s Reply" refer
to the Reply Memorandum of Law in further Support of Defendant's Motion for
Summary Judgment.  Citations to "Def.'s Ex." refer to exhibits attached to
Mr. Goodman's Affirmation.  Citations to "Pl.'s Ex." refer to exhibits
attached to Mr. Clarke's Declaration.

to advance to CHS, as borrower, funding of up to 80% of the face value of certain accounts receivable owed to CHS in exchange for a security interest in and the assignment of those receivables. (See generally Def.'s Exs. 1-2; Pl.'s Exs. A-C.)  CFC received direct payments from those factored accounts receivable (Clarke Aff. ¶ 4.), and was obligated to remit to CHS any surplus between the amount paid to CFC on account of the factored accounts receivable and monies advanced to CHS, less certain financing costs. (See Def.'s Ex. 2; Pl.'s Ex. B ("Upon receipt of payment from the [account debtor], [CFC] agrees to make payment by check to [CHS] for the difference between the payment received and the total of the [funds advanced] and the processing fees accrued . . . .").)  In addition, CFC had full recourse against CHS and its guarantors for any deficiency in the amounts advanced, and retained "a security interest in all of [CHS's] assets[,] including products and proceeds thereof." (Def.'s Ex. 2; Pl.'s Ex. B.)  CHS also entered into a General Continuing Guaranty Agreement with CFC on or about August 13, 1999 (the "Guaranty," and together with the Fee Agreement and Assignment, the "Factoring Agreement") (Def.'s Ex. 3; Pl.'s Ex. D), under which CHS guaranteed the obligations of a related entity, Better Medical Services P.C. ("BMS"). (Goodman Aff. ¶ 12; Def.'s Ex. 3 at Schedule A; Pl.'s Ex. D at Schedule A.)

Pursuant to the Assignment, CHS agreed to appoint CFC or any of its agents as its "true and lawful attorney-in-fact" to act on behalf of CHS in the collection of factored accounts receivable. (Def.'s Ex. 2; Pl.'s Ex. B.)  In addition, upon an account debtor's default, CHS agreed to "immediately pay to [CFC] . . . any and all accrued processing fees applicable plus reasonable attorneys' fees and costs of collection." (See Def.'s Ex. 2; Pl.'s Ex. B.)  Similarly, the Guaranty provides that CHS is liable for "all reasonable costs and expenses incurred by CFC in attempting or effectuating collection hereunder, including reasonable attorneys' fees, if any claim hereunder is referred to an attorney or collection thereof is undertaken by an attorney." (Def.'s Ex. 3; Pl.'s Ex. D.)  CFC also retained the right to "setoff any obligations owing to it by [CHS] against any funds or property held by [CFC] without notice to [CHS]." (Def.'s Ex. 2; Pl.'s Ex. B.)

The Assignment also provides that "all representations, warranties, covenants, powers and rights" therein are to be interpreted and construed under Virginia law. (Def.'s Ex. 2; Pl.'s Ex. B.)  In addition, the Guaranty provides that it cannot be changed or terminated orally, and its terms and obligations are to be interpreted according to Virginia law. (Def.'s Ex. 3; Pl.'s Ex. D.)  The terms of the Assignment and Guaranty are

4

incorporated into the Fee Agreement and made a part of the Fee
Agreement by reference. (Def.'s Ex. 1; Pl.'s Ex. A.)

## II.  **Prior Litigation**

After certain obligors of accounts receivable subject to
the Factoring Agreement defaulted on their debts, CFC brought
suit in this Court against CHS, BMS, and five obligors of the
accounts receivable:  St. Vincent's Hospital and Medical Center
("St. Vincent's"), Sisters of Charity Medical Center, Barnert
Hospital ("Barnert"), Staten Island University Hospital, Inc.
("Staten Island"), and St. Francis Hospital ("St. Francis").
(Def.'s 56.1 ¶¶ 3, 4; Def.'s Ex. 4; Pl.'s Ex. E; Cooke Aff. ¶
5.)  See Commerce Funding Corp. v. Comprehensive Habilitation
Servs., Inc. et al., No. 01 Civ. 3796 (PKL) (filed May 3, 2001)
(the "First Action").

### A.    **The Barnert Settlement**

On or about October 19, 2001, CHS, CFC, and CHS's
president, Peter Magaro, Ph.D, executed a settlement agreement
with Barnert that extinguished a suit brought in 1999 by CHS
against Barnert in the District of New Jersey for monies owed on
services performed by CHS for Barnert, and also settled claims
brought by CFC and CHS against Barnert in the First Action (the
"Barnert Settlement"). (Def.'s 56.1 ¶¶ 6, 7; Def.'s Ex. 5; Pl.'s
56.1 ¶ 7; Pl.'s Ex. G; Clarke Aff. ¶ 6-7.)  This Court so-
ordered the Barnert Settlement on October 31, 2001. (Def.'s Ex.

5; Pl.'s Ex. G.)  The Barnert Settlement stated that, pending

the outcome of the First Action, the proceeds of the settlement

would be placed in an escrow account with Barnert's counsel

until CHS and CFC told Barnert where to remit the proceeds.

(Def.'s 56.1 ¶ 8.)  Furthermore, the Barnert Settlement provided

that all funds Barnert paid would remain in escrow throughout

the pendency of the First Action. (Clarke Aff. ¶ 7; Def.'s Ex.

5; Pl.'s Ex. G.)

In August 2002, the Internal Revenue Service ("IRS") served

a Notice of Levy on Barnert with respect to the monies Barnert

owed to CHS. (Clarke Aff. ¶ 8.)  In September 2002, CFC advised

the IRS that CFC held a lien on the settlement proceeds in

escrow, which CFC believed superior to the IRS tax levy. (Id.;

Pl.'s Ex. I.)  On or about October 21, 2002, CFC, CHS, and the

IRS entered into a stipulation before this Court that

transferred the Barnert Settlement funds in escrow with

Barnert's counsel to a new escrow account overseen by CFC's

counsel under the same terms and conditions set forth in the

Barnert Settlement, with the additional term that any

disbursement of proceeds from the escrow account required seven

business days' prior notice to the IRS. (Def.'s 56.1 ¶ 10;

Def.'s Ex. 7 at 7-8; Clarke Aff. ¶ 9; Pl.'s Ex. H at 7-8.)

On October 28, 2002, CHS's attorney, John W. Clarke, Esq.,

instructed CFC's counsel, Ronald B. Goodman, Esq., to release

6

the escrowed Barnert Settlement funds, which amounted to
$500,000, to CFC. (Def.'s 56.1 ¶¶ 9, 11; Pl.'s 56.1 ¶ 11.)  At
the time the Barnert Settlement funds were released to CFC,
CFC's claim against CHS exceeded $500,000. (Def.'s 56.1 ¶ 13.)
The October 28 letter, which was set forth on the letterhead of
CHS's attorneys and signed by Mr. Clarke, states in relevant
part:

> [O]ur client requests that your Firm as the new escrow
> agent release the funds held in escrow ($500,000) to
> Commerce Funding Corporation.  Comprehensive
> Habilitation Services, Inc. recognizes that the claim
> of Commerce Funding Corporation is well in excess of
> $500,000 and wishes to apply the $500,000 against that
> claim.

(Def.'s Ex. 7; Pl.'s Ex. M.)

## B.   The CHS Settlement

On January 7, 2002, CFC, CHS, BMS, and Saint Vincent's
stipulated and agreed that all causes of action pending between
them in the First Action would be submitted to arbitration.
(Clarke Aff. ¶ 9; Pl.'s Ex. H at 4:5-6.)  Accordingly, this
Court remanded CFC's, CHS's, and BMS's claims against Saint
Vincent's to arbitration. (Def.'s 56.1 ¶ 5.)  By October 22,
2002, CFC had prepared a draft written settlement agreement
setting forth the settlement terms of those claims open among
and between CHS, CFC, and St. Vincent's (the "CHS Settlement").[3]

---

[3] Although a party to the arbitration, BMS did not participate in the CHS
Settlement.

(Def.'s 56.1 ¶ 16; Pl.'s 56.1 ¶ 16; Clarke Aff. ¶ 10.)  Under
the CHS Settlement, St. Vincent's would have paid a total of
$2.5 million as follows: $1.5 million to CFC, $615,000 to CHS,
and $385,000 to be held in escrow pending the outcome of
arbitration against BMS. (Def.'s 56.1 ¶ 19; Def.'s Ex. 12 ¶ 9;
Pl.'s 56.1 ¶ 19; Pl.'s Ex. J ¶ 9; Clarke Aff. ¶ 11.)  The CHS
Settlement was executed by CFC on November 5, 2002 and by CHS
sometime in November 2002. (Clarke Aff. ¶ 20.)

However, on November 7, 2002, St. Vincent's informed the
other settling parties that the IRS had previously served St.
Vincent's with a Notice of Levy, dated August 6, 2002, to
collect federal taxes owed by CHS. (Def.'s 56.1 ¶ 22; Clarke
Aff. ¶ 20.)  St. Vincent's would not execute the CHS Settlement
until CHS resolved the tax levy. (Def.'s 56.1 ¶ 23, 24; Pl.'s
56.1 ¶ 23.)  CHS maintains that it then sought to work out its
alleged tax liability with the IRS (Pl.'s 56.1 ¶ 23), and
eventually did,[4] purportedly informing CHS and St. Vincent's of
its agreement with the IRS by telephone message on December 19,

---

[4] The settlement reached was that CHS agreed to pay all taxes owed to the IRS.
(Def.'s 56.1 ¶ 39; Def.'s Ex. 29.)  However, as of December 2002, CHS lacked
funds to satisfy this obligation and could not discharge the levy. (Def.'s
56.1 ¶ 40.)  In addition, whether a settlement was in fact reached is
somewhat contradicted by an IRS telephone log included in the summary
judgment materials as Plaintiff's Ex. FF.  The log indicates that, as of
December 20, 2002, Joseph A. Pantoja, Esq., the Assistant U.S. Attorney
representing the IRS, was merely "optimistic" about a settlement and the
"possible payment of most of [the] tax liability." (Pl.'s Ex. FF at 1.)

8

2002 (Def.'s 56.1 ¶ 36) and by letter dated December 27, 2002. (Id. ¶ 35; Def.'s Ex. 18; Pl.'s 56.1 ¶ 35.)

Although the parties curiously disagree as to whether the CHS Settlement was ever in effect (compare Def.'s 56.1 ¶ 17 with Pl.'s 56.1 ¶ 17 and Clarke Aff. ¶ 20), it is undisputed that St. Vincent's never signed the CHS Settlement. (Clarke Aff. ¶ 22 ("CFC, CHS and St. Vincent['s] never completed the [CHS Settlement] because St. Vincent['s] refused to execute it due to the existence of the IRS Notice of Levy.").) In addition, CHS's principal, Dr. Magaro, acknowledged in deposition testimony that the CHS Settlement was never fully executed. (Def.'s 56.1 ¶ 18; Def.'s Ex. 13; Pl.'s Ex. K.) Moreover, in a December 5, 2002 letter, CFC's counsel requested that arbitrators hearing the dispute between CFC, CHS, St. Vincent's, and BMS reinstitute the arbitration proceeding and rule on CFC's motion for summary judgment. (Def.'s 56.1 ¶ 26.) CFC contends its December 5 letter to the arbitrators constituted its formal withdrawal from the proposed CHS Settlement (id. ¶ 27), and that CHS's counsel acknowledged as much several days later in a letter to the IRS.[5] (Id. ¶ 29.) However, CHS inexplicably disputes that CFC actually withdrew from the CHS Settlement, contending that CFC's

_____

[5] In a December 10, 2002 letter from Edward C. Daniel III, Esq., attorney for CHS, to Mr. Pantoja, attorney for the IRS, CHS writes, in relevant part: "Commerce Funding Corporation has withdrawn from the proposed settlement with CHS Inc. and St. Vincent's Hospital, and is seeking reinstitution of arbitration proceedings and a decision on its motion for summary judgment against CHS Inc. and St. Vincent's Hospital." (Def.'s Ex. 22.)

9

December 5 letter failed to say so unequivocally. (Pl.'s 56.1 ¶ 27.)

### C.   The Second Settlement

CFC discussed and eventually entered into a settlement agreement on or about December 20, 2002 with St. Vincent's and BMS, but without CHS, under which St. Vincent's paid CFC $1,445,500 (the "Second Settlement"). (Def's 56.1 ¶¶ 32, 33, 76.)  Pursuant to the Second Settlement, CFC received the full value of the defaulted accounts receivable, with no deficiency to be recovered from CHS. (Def.'s 56.1 ¶ 77.)  CHS asserts that CFC entered into the Second Settlement without notice to CHS. (Def.'s Ex. 21; Clarke Aff. ¶ 23.)  As explained above, notwithstanding this Second Settlement, CHS claims that CFC never terminated, revoked, or withdrew the CHS Settlement. (Def.'s 56.1 ¶ 43; Def.'s Ex. 21; Pl.'s 56.1 ¶ 43.)

After reviewing the terms of the Second Settlement, CHS sought return of the Barnert Settlement funds that were released to CFC.  In a letter dated January 20, 2003, CHS demanded that CFC return the $500,000 previously remitted to CFC pursuant to Mr. Clarke's October 28, 2002 letter. (See Def.'s 56.1 ¶ 44; Def.'s Ex. 23; Pl.'s 56.1 ¶ 44; Clarke Aff. ¶ 25.)  In the letter, Mr. Clarke referenced a "prior agreement" with Mr. Goodman as follows:

10

> [W]hen the Barnert Hospital settlement funds were
> released to CFC, an amount equal to the proceeds of
> the Barnert settlement ($500,000.00) was to be
> escrowed from CFC's portion of the [CHS Settlement]
> pending the outcome of the hearing of the BMS claims
> against CFC and St. Vincent.  Those escrowed funds
> were then to be released to CHS upon conclusion of the
> arbitration hearing.  Since CFC has, through its
> purported settlement of December 20, 2002, been
> released from the BMS claims, please immediately remit
> to Harris Beach LLP, as attorneys for CHS, the total
> proceeds of the Barnert Hospital settlement.

(Def.'s Ex. 23; Pl.'s Ex. W.)  However, CFC did not remit the

Barnert Settlement funds to CHS, having applied the funds to

partially satisfy CFC's claims against CHS in the First Action.

(Clarke Aff. ¶ 25.)

### D.    The Surplus Funds

In a January 3, 2003 letter, CFC informed CHS that the

combined funds from the Second Settlement and Barnert Settlement

would likely result in a surplus due from CFC to CHS, which CFC

would remit to CHS in exchange for general releases from CHS and

Dr. Magaro.[6] (Def.'s 56.1 ¶ 41; Def.'s Ex. 20.)  In a January 22,

2003 letter, CFC advised CHS that the surplus due from CFC to

CHS was $156,746, exclusive of legal fees incurred in January

2003. (Def.'s Ex. 19.)  However, CHS refused to provide a

general release to CFC in exchange for the surplus funds (Def.'s

56.1 ¶ 55), claiming that the Factoring Agreement did not

---

[6] CFC asserts that it requested a release because "[g]eneral releases are
exchanged as a matter of course," and, anticipating that CHS would challenge
the Second Settlement, found it "prudent that [CFC's] counsel retain [the]
surplus [funds] and deduct all further collection-related expenses there
from." (Def.'s Reply 56.1 ¶ 111.)

require CHS to provide such release. (Pl.'s 56.1 ¶ 55.)  On or
about January 24, 2003, this Court instructed CHS to refer its
concerns about the Second Settlement, including the surplus
funds, to arbitration prior to seeking relief from this Court.
(Def.'s 56.1 ¶ 80.)  However, the arbitrators declined to hear
new issues between CHS and CFC. (Id. ¶ 81.)

     A lengthy exchange developed between the parties regarding
the surplus funds.  By letter dated March 31, 2003, CHS demanded
that CFC remit the surplus due, plus interest, together with
releases of the Factoring Agreement and all related documents
that CHS executed. (Def.'s 56.1 ¶ 56.)  CFC informed CHS on
April 1, 2003 that it could not provide a release of the
Factoring Agreement due to the terms of the Second Settlement
(id. ¶ 58), and again requested a general release from CHS in
exchange for the surplus funds. (Id. ¶ 57.)  CHS renewed its
demand for the surplus on April 6, 2004 and April 28, 2004,
stating that it would seek this Court's intervention in the
First Action to recover the funds with costs. (Def.'s Exs. 26,
27.)  CFC remained unwilling to remit the funds without
obtaining the requested releases, citing CHS's "ongoing
obligation" to pay for CFC's legal fees under the Factoring
Agreement. (Def.'s 56.1 ¶ 61.)

### E.   Denial of CHS's Request to Amend its Amended Answer to Assert Counterclaims in the First Action

CHS resolved its cross-claims in the First Action as follows:  between CHS and St. Vincent's pursuant to arbitration;[7] between CHS and St. Francis pursuant to a bench verdict; and between CHS and Staten Island pursuant to a jury verdict. See Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc., No. 01 Civ. 3796, 2005 WL 1765715, at *2 (S.D.N.Y. July 25, 2005) (Leisure, J.).[8]  CHS then sought leave of this Court to amend its Amended Answer to assert counterclaims against CFC involving the propriety of the Second Settlement. Id.  In a July 25, 2005 Memorandum Order, the Court denied CHS's motion to amend its Amended Answer on the grounds that, pursuant to Federal Rule of Civil Procedure 16(b), CHS had failed to demonstrate good cause warranting a modification of its original scheduling order. (Def's 56.1 ¶ 84.) See Commerce Funding, 2005 WL 1765715, at *4-5.  The Court held that CHS failed to explain adequately its almost twenty-five-month delay in bringing its

---

[7] The arbitrators found that, once the funded accounts receivable were settled and compromised under the Second Settlement, CHS's obligations to CFC with respect to the funded accounts was satisfied. (Pl.'s Ex. V at 14.)  At that point, unfunded receivables that were security for funds advanced to CHS were effectively released back to CHS. (Id.)  The arbitrators determined that St. Vincent's was never obligated to pay CFC for the unfunded receivables (id. at 23); instead, CHS could have anticipated collecting on those receivables. (Id.)  The arbitrators awarded CHS damages, along with interest, attorneys' fees, and costs. (Id. at 24.)

[8] The Court's July 25, 2005 Memorandum Order is included in the summary judgment record as Defendant's Exhibit 37.

motion. (Def.'s 56.1 ¶ 85.) See Commerce Funding, 2005 WL
1765715, at *4.  Further, the Court determined that CFC would be
unduly prejudiced if the motion were granted because CFC would
have to undertake additional discovery after CFC had previously
settled with, or discontinued its action against, all defendants
except CHS, and after all cross-claims had been resolved.
Commerce Funding, 2005 WL 1765715, at *5.

     This Court also denied CHS's motion for reconsideration of
the Court's denial of leave to assert the proposed
counterclaims. (Def.'s 56.1 ¶ 91.) See Commerce Funding Corp. v.
Comprehensive Habilitation Servs., Inc., 233 F.R.D. 355, 363
(S.D.N.Y. 2005).[9]  The Court subsequently dismissed the First
Action, as there were no active claims pending. (Def.'s 56.1 ¶
88.) See Commerce, 233 F.R.D. at 363.

### III. **The Instant Action**

     While CHS's motion for leave to amend its Amended Answer
was pending, CHS filed the instant action, which was once again
assigned to this Court, alleging the claims embodied in its
proposed counterclaims. (Def's 56.1 ¶ 83.)

#### A.   **Factual Disputes**

     At the crux of the current litigation is a disputed oral
agreement that was purportedly formed over a series of telephone

---

[9] The Court's December 15, 2005 Opinion and Order are included in the summary
judgment record as Defendant's Exhibit 11.

14

conversations between CHS's attorney John W. Clarke, Esq., and CFC's attorney Ronald B. Goodman, Esq., during October 2002. (Clarke Aff. ¶ 13.) CHS asserts that it released the Barnert Settlement funds to CFC because CFC orally agreed to return the funds to escrow and ultimately remit the funds to CHS after CFC compromised and settled its claims in the First Action pursuant to the terms of the CHS Settlement. (Pl.'s 56.1 ¶¶ 12, 14; Clarke Aff. ¶¶ 2, 13.) In addition, CHS asserts that it instructed CFC's counsel in writing to release the Barnert Settlement funds to CFC in order to trigger the seven-day IRS notice requirement so that the IRS could demonstrate its entitlement to the Barnert Settlement funds. (Pl.'s 56.1 ¶¶ 11, 101.)

CHS claims that the oral agreement is memorialized in paragraph 14 of the CHS Settlement (Clarke Aff. ¶ 14), which states in relevant part:

> Upon final determination . . . , Commerce shall release . . . any remaining funds escrowed with regard to the Barnert Hospital Medical Center settlement . . . to Harris Beach LLP as attorneys for CHS . . . .

(Def.'s Ex. 12 ¶ 14; Pl.'s Ex. J ¶ 14.)[10] CHS argues that there would be no reason to provide for the release of "any remaining

---

[10] The Court notes that CHS makes contradictory assertions of fact, stating that the CHS Settlement "contains no agreement to re-escrow the Barnert Settlement funds, or funds equal thereto" (Pl.'s 56.1 ¶ 20), and yet that the CHS Settlement expressly "provides that any and all remaining funds held in escrow, including the Barnert [Settlement] Funds," which were released to CFC, would be paid to CHS at the conclusion of arbitration. (Id. ¶ 21.)

funds escrowed" if the Barnert Settlement funds had been
transferred outright to CFC. (Clarke Aff. ¶ 19.)[11]

CFC, however, asserts that the release of the Barnert
Settlement funds to CFC was not conditioned on any transfer of
funds back into escrow. (Def.'s 56.1 ¶ 14.)   Rather, CFC claims
that the Barnert Settlement funds were released without
condition or reservation. (Id. ¶ 12.)   CFC points to language in
Mr. Clarke's October 28, 2002 letter instructing Mr. Goodman's
firm, as escrow agent, to release the Barnert Settlement funds
to CFC in partial satisfaction of CFC's claims against CHS
(Def.'s 56.1 ¶¶ 11, 101; Def.'s Ex. 7), which CFC asserts
totaled approximately $1.8 million. (Goodman Reply Aff. ¶ 15.)
CFC further asserts that the reference to "any remaining funds
escrowed" in the draft CHS Settlement means the additional
$800,000 in payments to escrow - in yearly installments of
$80,000 commencing October 1, 2003 – that Barnert Hospital was
obligated to make pursuant to the terms of the Barnert
Settlement, and not the $500,000 transferred outright to CFC on
October 28, 2002. (Id. ¶¶ 6, 19; Def.'s Ex. 5 at ¶ 1(c).)   At

---

[11] As further evidence of the oral agreement, CHS proffers Dr. Magaro's May
2006 deposition testimony, in which he testified that CHS released the
Barnert Settlement funds to CFC based on assurances from CHS's counsel that
CFC's counsel had represented the funds would be used in the contemplated CHS
Settlement. (See Clarke Aff. ¶ 16; Pl.'s Ex. K at 52:14-17.)   However, Dr.
Magaro was not a party to the formation of the oral agreement, and only
testified as to what his attorney told him.   CHS also points to a fax that
Dr. Magaro sent to his attorney, Jeff Ruggiero, Esq., on December 16, 2002,
in which Dr. Magaro wrote that he planned to use $50,000 of the Barnert
Settlement Funds to pay legal fees. (Clarke Aff. ¶ 16; Pl's Ex. L.)   The
Court disregards this evidence as inadmissible hearsay.

most, Mr. Goodman swears under oath that he merely informed "Mr.
Clark[e] that CHS would receive *a credit* for payment on account
of what CHS owed [CFC] for escrowed Barnert Settlement [f]unds
transferred to [CFC]. . . ." (Goodman Reply Aff. ¶ 14.)   In
disputing the existence of the oral agreement, CFC contends that
there was no credible reason for CFC to re-escrow the Barnert
Settlement Funds, and that any agreement to do so "would be
tantamount to conspiring with CHS to defraud the IRS by
subverting their levy for unpaid withholding taxes." (Id. ¶ 14.)

   CHS further avers that, instead of re-escrowing the Barnert
Settlement funds and remitting the funds to CHS pursuant to the
CHS Settlement, CFC "secretly negotiated [the Second
Settlement], an agreement which excluded CHS, and kept the
$500,000 that had been transferred to it pursuant to the
[alleged] oral agreement." (Clarke Aff. ¶ 2.)   CFC asserts that
it negotiated the Second Settlement "because the lien priority
issue had yet to be resolved, and because of the constant threat
that St. Vincent['s] might declare bankruptcy." (Goodman Reply
Aff. ¶ 16.)   In addition, CFC contends that it had withdrawn
from the CHS Settlement, and provided express notice to all
parties of its withdrawal, by the time the Second Settlement was
negotiated. (Id. ¶ 24.)

### B.   The Instant Allegations

   CHS alleges that when CFC retained the Barnert Settlement

funds but did not execute the CHS Settlement, it wrongfully converted those funds. (Def.'s Ex. 8 ¶¶ 46-51; Pl.'s Mem. 6-9; Pl.'s Ex. EE ¶¶ 46-51.)[12]  In doing so, CHS further alleges that CFC intentionally and fraudulently misrepresented its intent to retain the Barnert Settlement funds and to enter into the CHS settlement, thus damaging CHS in the amount of those funds and unjustly enriching CFC. (Def.'s Ex. 8 ¶¶ 52-60; Pl.'s Mem. 19-25; Pl.'s Ex. EE ¶¶ 52-60.)  Finally, CHS contends that CFC breached the covenant of good faith and fair dealing implied in the CHS Settlement when CFC negotiated the Second Settlement and converted funds. (Def.'s Ex. 8 ¶ 67; Pl.'s Ex. EE ¶ 67.)  CFC counters that no oral agreement existed, and CFC was entitled to retain the Barnert Settlement funds transferred outright to CFC in express recognition of a lawful debt. (Def.'s Mem. 6, 11-13.)

CHS also alleges that, pursuant to the Second Settlement, CFC attempted to sell to St. Vincent's CFC's purported interest in unfunded accounts receivable owed by St. Vincent's to CHS, in order to deprive CHS of money CHS was owed and to "inequitably cut off CHS's right to recover the value of the accounts from St. Vincent['s]." (Clarke Aff. ¶ 23.)  CHS contends that, at the time CFC negotiated the Second Settlement, CFC knew the accounts receivable were merely security for funds advanced to CHS, and

---

[12] The summons and complaint are included in the summary judgment record as Defendant's Exhibit 8 and Plaintiff's Exhibit EE.

18

that the unfunded receivables were returnable to CHS once CFC
received all monies owed to it under the Factoring Agreement.
(Id.) CHS cites the decision of the arbitration panel,
subsequent to the Second Settlement, in which the arbitrators
rejected CFC's attempted sale of the receivables to St.
Vincent's on this ground. (Id. ¶ 24; Pl.'s Ex. V at 3, 11-13.)
CHS claims that CFC's attempted sale of unfunded receivables
breached the covenant of good faith and fair dealing implied in
the Factoring Agreement. (Pl.'s Mem. 14-19.)

    CFC contends that its sale of the receivables to St.
Vincent's was commercially reasonable. (Def.'s Mem. 16-20.)  In
addition, because CHS recovered in full from St. Vincent's
through its arbitration of this claim (see Pl.'s 56.1 ¶ 96), CFC
contends that CHS has been fully compensated for any damages
arising from CFC's sale of receivables back to St. Vincent's,
including attorneys' fees and costs. (Def.'s Reply 16-17;
Goodman Reply Aff. ¶ 30.)

    In addition, CHS claims that when CFC failed to remit
surplus funds to CHS and instead applied those surplus funds to
CFC's costs and attorneys' fees, CFC (i) breached the Factoring
Agreement and its implied covenant of good faith and fair
dealing (Def.'s Ex. 8 ¶¶ 61-64, 67; Pl.'s Mem. 16-19; Pl.'s Ex.
EE ¶¶ 61-64, 67), and (ii) was unjustly enriched. (Def.'s Ex. 8
¶ 59; Pl.'s Mem. 21; Pl.'s Ex. EE ¶ 59).  Both parties contend

the plain language of the Factoring Agreement supports their
position as to whether CFC was entitled to retain and use the
surplus funds for legal fees in the instant action.  CHS
contends that CFC was not entitled to apply the surplus funds to
legal costs because (i) any costs and legal fees incurred in
this action are outside the scope of the Factoring Agreement's
indemnification provisions, and (ii) since CFC wrongfully
retained the Barnert Settlement Funds, the Factoring Agreement
does not require CHS to indemnify CFC for wrongdoing. (Pl.'s
Opp'n 12.)  CFC disagrees and argues that the terms of the
Factoring Agreement allow CFC to "deduct from surplus [funds]
the cost, including attorney[s'] fees, incurred in defending
CHS'[s] . . . challenge [to] the [Second] Settlement" (Def.'s
Reply 56.1 ¶ 109) because such costs are "collection-related
expenses under the Factoring Agreement[]." (Def.'s Reply 56.1 ¶
110; see also Def.'s Mem. 10-11.) CFC claims that it has since
used the entire surplus to defend against CHS's challenges to
the Second Settlement. (Def.'s 56.1 ¶ 62; Goodman Aff. ¶ 54.)

## DISCUSSION

The Court begins by addressing the standards applicable to
summary judgment motions, and determining which state law should
apply to the claims in this case.  The Court then assesses each
of plaintiff's allegations premised on CFC's retention of
surplus funds pursuant to indemnification provisions in the

Factoring Agreement.  The Court next evaluates those claims that
are contingent on the existence of an alleged oral agreement
regarding the Barnert Settlement funds.  Finally, the Court
turns to CHS's claim premised on CFC's transfer of receivables
to St. Vincent's under the Second Settlement.

### I.   Standard of Review

Rule 56 of the Federal Rules of Civil Procedure allows for
the entry of summary judgment where "the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c).  The party moving for summary judgment
bears the "heavy burden" of demonstrating that no genuine issue
as to any material fact exists and that it is therefore entitled
to judgment as a matter of law. Nationwide Life Ins. Co. v.
Bankers Leasing Ass'n, Inc., 182 F.3d 157, 160 (2d Cir. 1999);
accord Atl. Mut. Ins. Co. v. CSX Lines, L.L.C., 432 F.3d 428,
433 (2d Cir. 2005) ("'The burden of showing that no genuine
factual dispute exists rests on the party seeking summary
judgment . . . .'" (quoting Sec. Ins. Co. of Hartford v. Old
Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004)));
Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994)
(Kearse, J.).  Nonetheless, summary judgment "is properly
regarded not as a disfavored procedural shortcut, but rather as

an integral part of the Federal Rules as a whole, which are
designed to secure the just, speedy and inexpensive
determination of every action." Celotex Corp. v. Catrett, 477
U.S. 317, 327 (1986).

A district court "must resolve all ambiguities and draw all
inferences in favor of the non-moving party," such that "[i]f
there is any evidence in the record from which a reasonable
inference could be drawn in favor of the non-moving party on a
material issue of fact, summary judgment is improper."
Westinghouse Credit Corp. v. D'Urso, 278 F.3d 138, 145 (2d Cir.
2002); accord Brown v. Cara, 420 F.3d 148, 152 (2d Cir. 2005)
("We will affirm the District Court's grant of summary judgment
to defendants only if, based on facts not in genuine dispute and
drawing all inferences in favor of plaintiffs, defendants are
entitled to judgment on the merits as a matter of law.").  Of
course, "'the mere existence of some alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment; the requirement is that
there be no *genuine* issue of *material* fact.'" Lang v. Ret.
Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991) (quoting
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).
"A dispute as to a material fact is 'genuine,' and hence summary
judgment is not appropriate, under this standard, only 'if the
evidence is such that a reasonable jury could return a verdict

for the nonmoving party.'" Id. (quoting Anderson, 477 U.S. at

248); accord N.Y. Stock Exch., Inc. v. New York, N.Y. Hotel LLC,

293 F.3d 550, 554 (2d Cir. 2002). "[T]he law provides no

magical talisman or compass that will serve as an unerring guide

to determine when a material issue of fact is presented. As is

so often true in the law, this is a matter of informed and

properly reasoned judgment." Am. Mfrs. Mut. Ins. Co. v. Am.

Broadcasting-Paramount Theatres, Inc., 388 F.2d 272, 279 (2d

Cir. 1967).

## II.   **Choice of Law**

It should be noted that neither party has offered a choice-

of-laws analysis to determine which state law should apply to

the claims in this case.[13]   Thus, choice of law is the first

issue the Court must address. Arkwright-Boston Mfrs. Ins. Co. v.

Calvert Fire Ins. Co., 887 F.2d 437, 439 (2d Cir. 1989) (Winter,

J.).

As a general matter, a district court sitting in diversity

jurisdiction applies the choice-of-law rules of the state in

which it sits. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313

U.S. 487, 496 (1941); Lee v. Bankers Trust Co., 166 F.3d 540,

545 (2d Cir. 1999) (McLaughlin, J.).   Thus, New York law will

---

[13] Although neither party has addressed choice-of-law issues, CFC has briefed
both Virginia and New York law in their papers, while CHS addresses primarily
Virginia law, except for its discussions of unjust enrichment and conversion,
which also refer to New York law, and its discussions of fraud, which only
refer to New York law.

apply for purposes of determining which state's substantive law will govern the claims in this case. Wall v. CSX Transp., Inc., 471 F.3d 410, 415 (2d Cir. 2006). Here, the Factoring Agreement contains a choice-of-law provision that looks to Virginia law, and "[a]s a general rule, choice of law provisions . . . are valid and enforceable in [New York]." Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000) (quoting Marine Midland Bank, N.A. v. United Mo. Bank, N.A., 223 A.D.2d 119, 643 N.Y.S.2d 528, 530 (N.Y. App. Div. 1996)) (internal quotation marks removed); Village on Canon v. Bankers Trust Co., 920 F. Supp. 520, 526 (S.D.N.Y. 1996) ("Choice of law clauses in loan documents and contracts are generally honored in New York." (citations omitted)); Freedman v. Chem. Constr. Corp., 43 N.Y.2d 260, 265 n. *, 372 N.E.2d 12, 15 n. * (N.Y. 1977) ("As a general matter, the parties' manifested intentions to have an agreement governed by the law of a particular jurisdiction are honored." (citation omitted)).

Moreover, "New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." Hartford Fire Ins. Co. v. Orient Overseas Containers Lines, 230 F.3d 549, 556 (2d Cir. 2000) (citation omitted); accord MSF Holding Ltd. v.

Fiduciary Trust Co. Int'l, 435 F. Supp. 2d 285, 293 (S.D.N.Y. 2006) (Leisure, J.) (same), aff'd 234 F. App'x 827 (2d Cir. 2007); see also Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003) (per curiam) ("[A]lthough, New York courts generally defer to the choice of law made by the parties to a contract . . . New York law allows a court to disregard the parties' choice when the most significant contacts with the matter in dispute are in another state." (internal quotations and citations removed)).

Here, relevant considerations weigh in favor of interpreting the provisions of the Factoring Agreement under Virginia law: defendant maintains its principal place of business in Virginia and the agreement specifies that Virginia is the forum of choice, which create sufficient contacts with Virginia; based on the record, there is no basis to conclude that application of Virginia law would perpetuate any fraud or violate public policy. Thus, Virginia substantive law will apply to those contract claims arising out of the use of the surplus funds pursuant to the terms of the Factoring Agreement.[14]

---

[14] Because breach of the implied covenant of good faith and fair dealing is a contractual cause of action, and the choice of law provision applies to the interpretation and enforcement of the contract, Virginia law applies to CHS's implied covenant claim arising out of the terms of the Factoring Agreement. See Commerce and Indus. Ins. Co. v. U.S. Bank Nat'l Ass'n, No. 07 Civ. 5731, 2008 WL 4178474, at *4 (S.D.N.Y. Sept. 3, 2008) (finding that breach of duty to act in good faith, as controlled by the implied covenant of good faith and fair dealing, is treated as a breach of contract claim for purposes of applying choice-of-law provisions); Butvin v. Doubleclick, Inc., No. 99 Civ. 4727, 2001 WL 228121, at *7 (S.D.N.Y. Mar. 7, 2001) (Keenan, J.) (holding

However, under New York law, extra-contractual claims "are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract . . . ." Finance One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 335 (2d Cir. 2005), cert. denied, 548 U.S. 904 (2006); Klock v. Lehman Bros. Kuhn Loeb, Inc., 584 F. Supp. 210, 215 (S.D.N.Y. 1984) (stating that, under New York law, "[a] contractual choice of law provision governs only a cause of action sounding in contract").[15] Thus, with respect to CHS's tort and quasi-contract claims, under New York law, the first step in a choice-of-law analysis is to determine whether an actual conflict of laws exists. Wall, 471 F.3d at

---

that claim for breach of the implied covenant of good faith and fair dealing was a contractual claim and fell within scope of choice-of-law provision indicating agreement would be governed and construed according to Delaware law).

[15] The Court looks to New York law to determine the scope of a contractual choice-of-law clause. Finance One, 414 F.3d at 333. Although the Second Circuit has noted New York courts' reluctance to construe choice-of-law clauses to encompass non-contractual causes of action, id. at 334, the clause here, which states the Factoring Agreement "shall be interpreted according to the law of the Commonwealth of Virginia," is clearly not "sufficiently broad" to reach claims "incident to the contract." See Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996). Compare Capital Z Fin. Svcs. Fund II, L.P. v. Health Net, Inc., 43 A.D. 3d 100, 109, 840 N.Y.S.2d 16, 23 (N.Y. App. Div. July 5, 2007) (acknowledging that "a limited choice of law provisions may not determine claims of fraud," but finding that plaintiff's fraud claim fell squarely within broad terminology of choice-of-law provision that encompassed "'all issues' concerning 'enforcement of the rights and duties of the parties'") (citation omitted), with Krock, 97 F.3d at 645 (finding choice-of-law clause stating document would "be governed by and construed in accordance with laws of Commonwealth of Massachusetts" was not sufficiently broad as to encompass tort claims), and Knieriemen v. Bache Halsey Stuart Shields, Inc. 74 A.D. 2d 290, 293, 427 N.Y.S.2d 10, 12-13 (N.Y. App. Div. 1980) (holding choice-of-law clause that "recited that '[t]his contract shall be governed by the laws of the State of New York" did not bind parties as to causes of action in tort), overruled on other grounds by Rescildo v. R.H. Macy's, 187 A.D.2d 112, 114, 594 N.Y.S.2d 139, 142 (N.Y. App. Div. 1993).

415; Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998); In re Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219, 223, 613 N.E.2d 936, 937 (1993). An actual conflict of laws exists where there are "relevant substantive differences that could have a significant impact on the outcome of the case." Finance One, 414 F.3d at 332. "If no conflict is found between the law of the forum and any other jurisdiction whose law is invoked, then the Court should apply the law of the forum." Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Pub. Co., 580 F. Supp. 2d 285, 290 (S.D.N.Y. 2008) (citing Excess Ins. Co. v. Factory Mut. Ins. Co., 2 A.D.3d 150, 151, 769 N.Y.S.2d 487 (N.Y. App. Div. 2003), aff'd 3 N.Y.3d 577, 789 N.Y.S.2d 461 (N.Y. 2004)); see also Eagle Access, LLC v. BHA, Inc., No. 05 Civ. 2837, 2007 WL 193725, at *3 (S.D.N.Y. Jan. 25, 2007) ("Under New York law, the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved; if no conflict exists, then the inquiry ends." (citing Stolarz, 81 N.Y.2d at 223, 613 N.E.2d at 937)).

As discussed further below, there is no actual conflict with respect to New York and Virginia law on the extra-contractual claims. Accordingly, this Court will apply New York law to the tort and quasi-contract claims arising out of the use of the Barnert Settlement funds. In addition, since there is no

27

discernable difference on the contract formation issues under
the laws of New York or Virginia, the Court will assess CHS's
allegation that an oral agreement existed between CFC and CHS
under New York law.  Similarly, the Court will also apply New
York law to CHS's claims for breach of the implied covenant of
good faith and fair dealing arising out of CFC's alleged failure
to complete the CHS Settlement and execution of the Second
Settlement, as the laws of New York and Virginia are in accord
on these implied covenant claims.

### III. **Claims Arising Out of the Use of the Surplus Funds**

CFC argues that it is entitled to summary judgment
dismissing CHS's claims for breach of the Factoring Agreement,
breach of the covenant of good faith and fair dealing, and
unjust enrichment in connection with CFC's withholding of the
surplus funds because the plain language of the Factoring
Agreement permits CFC to retain the surplus in anticipation of
legal fees and costs it would incur in defending the validity of
the Second Settlement, and to offset the surplus otherwise due
to CHS with attorneys' fees associated with the collection of
factored accounts and with defending matters arising from the
Factoring Agreement, including in this action. (See Def.'s Mem.
10-11.)  CHS contends that the plain language of the Factoring
Agreement does not permit CFC to retain and use the surplus
money to pay attorneys' fees and costs incurred after CFC

compromised and settled its claims in the Second Settlement.
(See Pl.'s Mem. 12.)

## A.  Interpretation of Attorneys' Fees and Setoff Provisions

### i.  Applicable Law

In contract disputes, the Court may only grant summary
judgment where the contract's language is unambiguous. See
World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 245
(4th Cir. 1992).  The first step is "to determine whether, as a
matter of law, the contract is ambiguous or unambiguous on its
face." Id.  A contract is ambiguous if "'susceptible of two
reasonable interpretations.'" Id. (quoting Am. Fidelity & Cas.
Co. v. London & Edinburgh Ins. Co., 354 F.2d 214, 216 (4th Cir.
1965)); see also Atalla v. Abdul-Baki, 976 F.2d 189, 192 (4th
Cir. 1992) ("'If there is more than one permissible inference as
to intent to be drawn from the language employed, the question
of the parties' actual intention is a triable issue of fact.'"
(quoting Bear Brand Hosiery Co. v. Tights, Inc., 605 F.2d 723,
726 (4th Cir. 1979))).  However, "a document is not ambiguous
merely because the parties disagree as to the meaning of the
language employed by them in expressing their agreement." Amos
v. Coffey, 228 Va. 88, 92, S.E.2d 335, 337 (Va. 1984) (internal
quotation marks and citation omitted).

If the Court properly concludes that the contract is
"unambiguous on the dispositive issue, it may then properly

interpret the contract as a matter of law and grant summary
judgment because no interpretive facts are in genuine issue."
World-Wide Rights, 955 F.2d at 245.  Even where, as a matter of
law, the Court finds the contract language ambiguous, the Court
may still examine extrinsic evidence provided on the record
"and, if that evidence is, as a matter of law, dispositive of
the interpretive issue, grant summary judgment on that basis."
Id. (citing Jaftex Corp. v. Aetna Cas. and Sur. Co., 617 F.2d
1062, 1063 (4th Cir. 1980)).  Where extrinsic evidence provided
on the record leaves genuine issues of material fact in
interpreting the contract, summary judgment is inappropriate.
Atalla, 976 F.2d at 195.

### ii.  Application

The first question this Court must answer is whether the
attorneys' fees and setoff provisions in the Factoring Agreement
are unambiguous.  Pursuant to those provisions, CHS agreed to
appoint CFC or any of its agents as its "true and lawful
attorney-in-fact" to act on behalf of CHS in the collection of
factored accounts receivable, and, in the event of an account
debtor's default, if any claim under the Factoring Agreement
were referred to an attorney or an attorney were to undertake
collection of such a claim, CHS agreed to pay reasonable
attorneys' fees "incurred by [CFC] in attempting or effectuating
collection" under the Factoring Agreement. (Def.'s Exs. 2-3;

30

Pl.'s Exs. B, D.) CFC also retained the right to "setoff any obligations owing to it by [CHS] against any funds or property held by [CFC] without notice to [CHS]." (Def.'s Ex. 2; Pl.'s Ex. B.)

The phrase "in attempting or effectuating collection hereunder" plainly includes the negotiation and execution of the Second Settlement, which resolved collection on factored accounts with St. Vincent's. However, it seems the issue is whether a trier of fact could reasonably conclude that the attorneys' fees and setoff provisions plainly encompass future legal costs CFC anticipated it would incur in defending the validity of the Second Settlement. This Court finds, as a matter of law, that the plain and unambiguous language of the Factoring Agreement does not support such a conclusion. See Centennial Broad., LLC v. Burns, 254 F. App'x 977, 981-82 (4th Cir. 2007) (per curiam) ("Under Virginia law, when the terms of a contract are clear and unambiguous, the interpretation of those terms presents a question of law." (citation omitted)).

First, CHS's liability for CFC's attorneys' fees is clearly limited to the specific instance of collecting on factored receivables. Second, CHS's obligation to pay attorneys' fees "*incurred* by [CFC] in attempting or effectuating collection" is written in the perfective. Once CFC executed the Second Settlement, thereby effectuating collection of factored

31

receivables, it was obligated to calculate the difference
between the amount paid to CFC on account of the factored
receivables and monies advanced to CHS, less certain costs.  At
that point, CFC exercised its contractual rights by factoring
into its calculations the reasonable legal fees that CFC had
incurred effectuating collection of the receivables, and
determined that it was obligated to remit surplus monies to CHS.
(See Def.'s Ex. 19.)  The attorneys' fees provisions are not
written broadly enough to permit CFC to retain the surplus to
apply against expenses CFC might incur after collecting on CHS's
indebtedness. See also Bonnie & Co. Fashions, Inc. v. Bankers
Trust Co., 955 F. Supp. 203, 215-20 (S.D.N.Y. 1997) (holding
merchandiser was liable for attorneys' fees incurred by bank as
"expenses of collection" under Factoring Agreement's attorneys'
fees indemnification clause, but clause was not so unmistakably
clear as to encompass legal costs arising out of litigation
between the parties on contract claims), reconsideration denied,
171 F.R.D. 79 (S.D.N.Y. 1997); cf. Lone Mountain Processing,
Inc. v. Bowser-Morner, Inc., No. 2:00CV00093, 2005 WL 1894957,
at *7 (W.D. Va. Aug. 10, 2005) (finding that express language of
indemnification provision in contract governed by Virginia law,
which encompassed "'all claims, demands, or lawsuits . . .
aris[ing] from or . . . connected with'" contract, was broad
enough to cover damages incurred after technical completion of

contract itself).

Similarly, the only reasonable reading of CFC's contractual right to "setoff any obligations *owing* to it by [CHS]" is that the provision creates a right to setoff a sum certain for a debt already owing to CFC, not an unliquidated amount CFC might incur in the future.  As such, CFC cannot rely on the setoff language for the proposition that it had unbridled discretion to retain the surplus monies to setoff against future attorneys' fees it might or might not incur defending the validity of the Second Settlement.  Indeed, the surplus provision would have little meaning if CFC could indefinitely hold monies it identified as surplus.

Accordingly, defendant's proffered interpretation of the attorneys' fees provisions is rejected as a matter of law. Defendant's motion for summary judgment on the breach of contract claim arising out of CFC's retention of the surplus funds is denied.[16]

## B.   Breach of Implied Covenant of Good Faith and Fair Dealing

### i.   Applicable Law

"Under Virginia law, every [commercial] contract contains an implied covenant of good faith and fair dealing; however, a

---

[16] Given the Court's reading of the indemnification and setoff provisions in the Factoring Agreement and defendant's undisputed use of the surplus funds to cover legal fees in the instant action, at trial, plaintiff will need to prove what damages, if any, it has actually incurred.

breach of those duties only gives rise to a breach of contract claim, not a separate cause of action." Frank Brunckhorst Co., L.L.C. v. Coastal Atl., Inc., 542 F. Supp. 2d 452, 462 (E.D. Va. 2008) (citation omitted); accord Charles E. Brauer Co. v. NationsBank of Va., N.A., 251 Va. 28, 33, 466 S.E.2d 382, 385 (Va. 1996) (holding that "the failure to act in good faith . . . does not amount to an independent tort" and "the breach of the implied duty . . . gives rise only to a cause of action for breach of contract" (citation omitted)); see also Va. Vermiculite, Ltd. v. W.R. Grace & Co., 156 F.3d 535, 542 (4th Cir. 1998) ("[I]t is a basic principle of contract law in Virginia, as elsewhere, that although the duty of good faith does not prevent a party from exercising its explicit contractual *rights,* a party may not exercise contractual *discretion* in bad faith, even when such discretion is vested solely in that party." (citation omitted)); Richmond Metro. Auth. v. McDevitt St. Bovis, Inc., 256 Va. 553, 558, 507 S.E.2d 344, 347 (Va. 1998) ("[A] party can, in certain circumstances, show both a breach of contract and a tortious breach of duty. . . . However, "the duty tortiously or negligently breached must be . . . not one existing between the parties solely by virtue of the contract." (internal quotation marks and citations omitted)).[17]

---

[17] CFC erroneously interprets Ward's Equip., Inc. v. New Holland N. Am., 254

## ii.   Application

Here, plaintiff's implied covenant claim is premised on the same set of facts underlying CHS's claim for breach of contract. Because an allegation of breach of the contractual duty of good faith and fair dealing is considered a breach of the underlying contract, see Frank Brunckhorst Co., 542 F. Supp. 2d at 462; Charles E. Brauer Co., 251 Va. at 33, 466 S.E.2d at 385, CHS's claim is redundant as a matter of law.  Accordingly, summary judgment is granted in favor of defendant on CHS's claim for breach of the implied covenant of good faith and fair dealing predicated on CFC's retention and use of the surplus funds.

## C.   Unjust Enrichment[18]

To the extent that CHS argues that CFC has been unjustly enriched by retaining the surplus funds and offsetting legal

---

Va. 379, 385, 493 S.E.2d 516, 520 (Va. 1997), as standing for the proposition that Virginia law does not recognize a claim for breach of the implied covenant of good faith and fair dealing.  The Virginia Supreme Court's statement in Ward's that "when parties to a contract create valid and binding rights, an implied covenant of good faith and fair dealing is inapplicable to those rights," 254 Va. at 385, 493 S.E. 2d at 520, applies only insofar as the alleged breach concerns conduct premised on explicit contractual rights.

[18] Since CHS's unjust enrichment claim is not within the scope of the contractual choice-of-law provision in the Factoring Agreement, the Court disposes of this claim under New York law, as Virginia and New York law are in accord with respect to this issue, and the claim would thus be dismissed as a matter of law in either jurisdiction.  See, e.g., Schwam v. XO Commc'n, Inc., No. 05-1060, 2006 U.S. App. LEXIS 7428, *5 (4th Cir. Mar. 24, 2006) ("[U]nder Virginia law, an unjust enrichment claim will not lie when an express contract exists between the parties."); Frank Brunckhorst Co., 542 F. Supp. 2d at 465 ("[A] party may not recover for claims sounding in quasi-contract or unjust enrichment when an express or implied contract already governs its relationship with a defendant." (citations and internal quotation marks omitted)); Vollmar v. CSX Transp., Inc., 705 F. Supp. 1154, 1176 (E.D. Va. 1989) ("Unjust enrichment claims can arise only where . . . there is no express contract, whether written, oral or both."), aff'd 898 F.2d 413 (4th Cir. 1990).

35

costs against those funds (see Pl.'s Mem. 19, 21), such claim
must be dismissed as a matter of law.  The undisputed existence
of a valid, controlling contract - in this case, the Factoring
Agreement - bars a claim for unjust enrichment. See, e.g., Beth
Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J.,
Inc., 448 F.3d 573, 587 (2d Cir. 2006) (dismissing unjust
enrichment claim on account of contractual relationship between
parties); Valley Juice Ltd. Inc. v. Evian Waters of Fr., Inc.,
87 F.3d 604, 610 (2d Cir. 1996) ("'The existence of a valid and
enforceable written contract governing a particular subject
matter ordinarily precludes recovery in quasi contract for
events arising out of the same subject matter.'" (quoting Clark-
Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193,
521 N.Y.S.2d 633, 656 (N.Y. 1987))). Therefore, summary judgment
is granted to defendant with respect to CHS's unjust enrichment
claim premised on CFC's retention of the surplus funds.

## IV.  Claims Arising Out of the Use of the Barnert Settlement Funds

CHS's claims for conversion and unjust enrichment are
premised on the idea that CFC unlawfully appropriated funds
belonging to CHS when CFC failed to re-escrow the Barnert
Settlement Funds for CHS's benefit and instead applied those
funds to partially satisfy CFC's claims against CHS.   In
addition, CHS claims that CFC committed fraud by misrepresenting

36

its intention to retain the Barnert Settlement Funds, rather
than re-escrowing those funds for CHS's benefit.  CHS also
asserts that CFC breached the covenant of good faith and fair
dealing when CFC secretly entered into the Second Settlement,
which excluded CHS, and allegedly converted the Barnert
Settlement funds.

## A.    Existence of Oral Agreement

At the outset, the Court turns to plaintiff's pivotal
assertion that an oral agreement existed between CHS and CFC
with regard to the Barnert Settlement funds because plaintiff's
conversion, unjust enrichment, fraud, and breach of implied
covenant claims arise out of the alleged breach of this
purported oral contract.[19]  For the reasons discussed below, the
Court finds that CHS has not raised a triable issue of fact
regarding the existence of such an oral agreement.

### i.    Parol Evidence Rule

Defendant argues that the October 28, 2002 letter from
CHS's counsel authorizing CFC's counsel to release and remit the
escrowed Barnert Settlement funds to CFC in partial satisfaction

---

[19] The terms of the alleged oral agreement are somewhat unclear because the
terms as characterized by CHS during the First Action are different from
those described in CHS's briefing papers on summary judgment.  In its
briefing papers, CHS claims that CFC promised to re-escrow the Barnert
Settlement funds for CHS's eventual benefit.  However, in a January 20, 2003
letter to Mr. Goodman, Mr. Clarke characterizes the promise as one to escrow
from CFC's portion of the contemplated CHS Settlement "an amount equal to the
proceeds of the Barnert Settlement ($500,000)" pending the disposition of
counterclaims BMS asserted against CFC. (Goodman Reply Aff. ¶ 20; Def.'s Ex.
23; Pl.'s Ex. W.)

of CFC's claims against CHS constitutes a fully integrated writing, and thus, defendant's alleged antecedent promise to re-escrow those funds is barred by the parol evidence rule. (See Def.'s Reply 9.)[20]

### a. Applicable Law

Generally, the parol evidence rule prohibits the use of prior or contemporaneous oral agreements to explain, modify,

---

[20] Generally, this Circuit disfavors raising new issues or arguments on reply. See, e.g., Keefe v. Shalala, 71 F.3d 1060, 1066 n.2 (2d Cir. 1995) (citation omitted); Knipe v. Skinner, 999 F.2d 708, 711 (2d Cir. 1993) (Winter, J.). However, here, defendant's argument responds to plaintiff's new theory in its opposition brief that the oral agreement is an oral modification of the Factoring Agreement (see Pl.'s Mem. 2-3), and thus the Court may properly consider defendant's arguments. See Scherer v. Equitable Life Assur. Soc'y of the U.S., No. 01 Civ. 10193, 2004 WL 2101932, at *5 n.1 (S.D.N.Y. Sept. 21, 2004) (deciding defendant's motion for partial summary judgment based on grounds asserted in moving brief and in reply brief, to extent reply papers addressed plaintiff's opposition arguments); Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 945 F. Supp. 693, 708 (S.D.N.Y. 1996) (stating that "reply papers may properly address new issues raised in the opposition papers" (internal quotation marks and citation omitted)), abrogated on other grounds by TVT Records v. Island Def Jam Music Group, 412 F.3d 82 (2d Cir. 2005). The Court briefly notes that it finds no merit to CHS's argument that the alleged oral agreement modified the Factoring Agreement. (Pl.'s Mem. 2-3.) A written contract that is not required to be in writing by the Statute of Frauds may be modified by a new oral contract. See Lindsay v. McEnearney Assocs., Inc., 260 Va. 48, 53, 531 S.E.2d 573, 576 (Va. 2000); Reid v. Boyle, 259 Va. 356, 369, 527 S.E.2d 137, 144-45 (Va. 2000). If the Statute of Frauds requires a contract to be in writing, however, any modification to that contract must also be in writing. See Lindsay, 260 Va. at 52; 531 S.E.2d at 575-76. If subsequent oral modification is permitted, plaintiff must prove mutual assent to the oral modification by "clear, unequivocal and convincing evidence, direct or implied." Reid, 259 Va. at 370, 527 S.E.2d at 145. Plaintiff must also show the modification was supported by consideration. Id. Because the Statute of Frauds requires that "[a]ny agreement or promise to lend money or extend credit in an aggregate amount of $25,000 or more must be in writing to be enforceable," Charles E. Brauer Co., 251 Va. at 34, 466 S.E.2d at 385 (citing Va. Code Ann. § 11-2(9)), any subsequent modification of the Factoring Agreement must also be in writing and signed by the party to be charged. See Lindsay, 260 Va. at 52; 531 S.E.2d at 575-76. Notwithstanding that CHS has not provided clear, unequivocal, and convincing evidence that any oral agreement was reached, as explained infra, and it is entirely unclear from CHS's brief how the Factoring Agreement was purportedly modified, any alleged oral modification of the Factoring Agreement would not be enforceable.

vary, or supplement "the meaning of a contract that the parties
have reduced to an unambiguous integrated writing." Gualandi v.
Adams, 385 F.3d 236, 241 (2d Cir. 2004) (citing 11 Richard A.
Lord, Williston on Contracts § 33:1, at 541 (4th ed. 1999)); see
FaceTime Commc'ns, Inc. v. Reuters Ltd., No. 08 Civ. 4730, 2008
WL 2853389, at *5 (S.D.N.Y. July 22, 2008) ("[P]arol evidence
about a contract party's unexpressed intentions is inadmissible
to vary the plain meaning of the contract's language; in
determining the intention of the parties it is their objective
manifestations of intent (found in the words of the agreement),
not their unexpressed subjective intentions, that control."
(citations omitted)); S. Road Assocs., LLC v. Int'l Bus. Machs.
Corp., 4 N.Y.3d 272, 278, 826 N.E.2d 806, 809 (N.Y. 2005)
("[E]xtrinsic and parol evidence is not admissible to create an
ambiguity in a written agreement which is complete and clear and
unambiguous upon its face" (internal quotation marks and
citation omitted)).

    For the parol evidence rule to apply, the parties must have
intended the agreement "to constitute the complete and final
expression of their agreement." Gualandi, 385 F.3d at 241
(citing Starter Corp. v. Converse, Inc., 170 F.3d 286, 295 (2d
Cir. 1999)); see also Fogelson v. Rackfay Const. Co., 300 N.Y.
334, 338, 90 N.E.2d 881, 882 (N.Y. 1950) (stating that the parol
evidence rule "does not, however, apply where the written

contract was not intended to embody the entire agreement between the parties"). A written contract is considered integrated when the parties intend it to constitute the complete and final expression of their agreement. Fogelson, 300 N.Y. at 338, 90 N.E.2d at 882; see Mun. Capital Appreciation Partners, I, L.P. v. Page, 181 F. Supp. 2d 379, 392 (S.D.N.Y. 2002) ("If the written document 'appears to contain the engagements of the parties, and to define the object and measure the extent of such engagement, [then] it constitutes the contract between them, and is presumed to contain the whole of that contract.'" (quoted reference omitted)); Stroll v. Epstein, 818 F. Supp. 640, 645 (S.D.N.Y. 1993) ("[A] contract which appears complete on its face is an integrated agreement as a matter of law." (internal quotation marks and citation omitted)), aff'd, 9 F.3d 1537 (2d Cir. 1993); Wilson-Gray v. Jay Feinberg Ltd., No. 90 Civ. 0001, 1990 WL 209635, at *2 (S.D.N.Y. Dec. 17, 1990) (stating that where a writing "seems on its face to be a definite and complete statement of the parties' agreement, parol evidence of antecedent oral agreements, negotiations, or understanding is not admissible to vary or contradict the writing" (citation omitted)).[21]

---

[21] There is no discernable difference between New York and Virginia law on the parol evidence rule. See, e.g., Va. Elec. and Power Co. v. N. Va. Reg'l Park Auth., 270 Va. 309, 316, 618 S.E.2d 323, 326-27 (Va. 2005) ("'[I]n controversies between two parties to a contract, parol evidence of prior or contemporaneous oral negotiations or stipulations is inadmissible to vary,

In the absence of an express integration clause, the Court reads the writing in light of the surrounding circumstances to determine whether the parties intended the writing to constitute the complete and final expression of their agreement. Starter Corp., 170 F.3d at 295 (citing Bourne v. Walt Disney Co., 68 F.3d 621, 627 (2d Cir. 1995)).  Factors the Court considers when making such determination include:

> whether the document in question refers to the oral agreement, or whether the alleged oral agreement between the parties is the sort of complex arrangement which is customarily reduced to writing; whether the parties were represented by experienced counsel when they entered into the agreement; whether the parties and their counsel negotiated during a lengthy period, resulting in a specially drawn out and executed agreement, and whether the condition at issue is fundamental; if the contract, which does not include the standard integration clause, nonetheless contains working like 'in consideration of the mutual promises herein contained, it is agreed and covenanted as follows,' and ends by stating that 'the foregoing correctly sets forth your understanding of your understanding of our Agreement.'

Morgan Stanley High Yield Secs., Inc. v. Seven Circle Gaming Corp., 269 F. Supp. 2d 206, 214 (S.D.N.Y. 2003) (citations

---

contradict, add to, or explain the terms of a complete, unambiguous, unconditional, written instrument.'" (quoting Godwin v. Kerns, 178 Va. 447, 451, 17 S.E.2d 410, 412 (Va. 1941))); Durham v. Nat'l Pool Equip. Co. of Va., 205 Va. 441, 446-47, 138 S.E.2d 55, 59 (Va. 1964) (""Under [the parol evidence] rule[,] when the parties set out the terms of their agreement in a clear and explicit writing then such writing is . . . the sole evidence of the agreement. . . .  [W]here it is apparent that the written contract is not a complete integration of all prior and contemporaneous negotiations which have been agreed upon by the parties, then parol evidence is admissible to supply those things omitted if . . . not inconsistent with or contrary to the writing." (internal citations omitted)).

omitted).

"[I]f a writing is not integrated, . . . parol evidence of additional contract terms may be admitted to complete the agreement, so long as the additional terms do not contradict the written terms." Joseph Victori Wines, Inc. v. Vina Santa Carolina S.A., 933 F. Supp. 347, 352 (S.D.N.Y. 1996) (citation omitted); see Jofen v. Epoch Biosciences, Inc., No. 01 Civ. 4129, 2002 U.S. Dist. LEXIS 12189, at *17 (S.D.N.Y. July 8, 2002) (stating that even where writing is not fully integrated, parol evidence may not be admitted to vary or contradict writing's content (citations omitted)).

### b. Application

Here, although the operative agreement for determining whether the parol evidence rule applies does not contain a formal integration clause, the writing is not necessarily incomplete. See Kempf v. Mitsui Plastics, Inc., No. 96 Civ. 1106, 1996 WL 673812, at *7 (S.D.N.Y. Nov. 20, 1996). On the contrary, the letter signed by CHS's counsel, set forth on firm letterhead, addressed to CFC's counsel, and outlining the terms of the release of the escrowed Barnert Settlement funds appears complete on its face for several reasons. First, it identifies the amount of escrowed funds, the party receiving those funds, the purpose for which the funds were released, and how the funds should be used. In addition, the funds released were the

42

subject of lengthy negotiations between the parties during the
First Action, and were placed into escrow pursuant to a
stipulation entered into before this Court on October 21, 2002;
the funds were only to be released by joint consent of the
parties or judgment of the Court. (See Def.'s Ex. 6 at 7:7-18;
Pl.'s Ex. H at 7:7-18)  Thus, the letter must confirm the
parties' joint understanding for the disposition of the escrowed
funds.  Moreover, the letter includes no mention of the alleged
promise to re-escrow the funds, and it is hard to understand why
a term so central to the transaction would be omitted from the
agreement. See Morgan Stanley, 269 F. Supp. 2d at 215 (finding
agreement that lacked integration clause complete on its face
where agreement specified contracting parties, the manner, place
and price of item to be sold, and where alleged oral funding
contingency crucial to contract's enforceability would normally
be included in such agreement); Itar-Tass Russian News Agency v.
Russian Kuner, No. 95 Civ. 2144, 1999 U.S. Dist. LEXIS 1101, at
*33-35 (S.D.N.Y. Feb. 1, 1999) (Koeltl, J.) (barring parol
evidence of alleged oral agreement to cap litigation expenses
that contradicted terms of written retainer agreement, which
addressed straightforward transaction, set forth payment terms
and mutual promises, and where fee cap was central to agreement
to pay expenses and would ordinarily be reduced to writing).
Finally, the parties do not claim that the letter is unclear or

43

ambiguous.  Read in light of the surrounding circumstances, the writing therefore constitutes an integrated agreement between the parties superseding any prior alleged oral promises.  As such, the integrated agreement cannot be contradicted or modified by parol evidence.

Even if the agreement were not fully integrated, the parol evidence rule would still bar evidence of the purported antecedent oral agreement because it contradicts the terms of a later writing between the two parties governing the same subject matter.  See Petereit v. S.B. Thomas, Inc., 63 F.3d 1169, 1177 (2d Cir. 1995) (finding that even if letters confirming oral negotiations of distributorship agreements were "only partial articulations of the parties' agreements, the parol evidence rule would still operate to exclude oral testimony of contract terms inconsistent with those contained in the writings").  The essential purpose of the oral agreement – the disposition of the escrowed Barnert Settlement funds – was embodied in a subsequent writing:  the October 28, 2002 letter, wherein the escrowed funds were released to CFC outright and in partial satisfaction of CFC's claims against CHS. (Def.'s Ex. 7; Pl.'s Ex. M.)  Notwithstanding express language to the contrary, CHS asserts that CFC promised to re-escrow those funds for CHS's eventual benefit, rather than applying those funds to CFC's claims against CHS.  However, such contractual term is both

44

conspicuously absent from the letter and flatly inconsistent
with CHS's instructions to apply the Barnert Settlement funds to
partially satisfy CFC's claims against CHS.  Therefore, the
alleged oral agreement cannot be read compatibly with CHS's
written agreement.  Evidence of the alleged oral promise is
effectively barred in accordance with the parol evidence rule.

Even if parol evidence were admissible, the record does not
provide a basis of admissible corroborative evidence from which
a reasonable jury could conclude that an oral agreement existed.
Other than its attorney's affidavit, CHS relies on a January
2003 letter from CHS's attorney referencing the parties' "prior
agreement" to escrow $500,000 from CFC's portion of the CHS
Settlement (see Def.'s Ex. 23; Pl.'s Ex. W) and paragraph 14 of
the draft CHS Settlement (Def.'s Ex. 12; Pl's Ex. J) to support
its claim that an oral agreement existed.  The January 2003
letter references terms allegedly part of the failed CHS
Settlement, which was never completed due to CHS's unresolved
tax liability, but such terms do not actually appear in the
draft of the CHS Settlement.  In fact, CHS's claim that the oral
agreement is memorialized in paragraph 14 of the draft CHS
Settlement is entirely unreasonable, as the paragraph clearly
refers to funds that would be escrowed pursuant to the Barnert
Settlement, which contemplated that Barnert Hospital would make
additional payments to escrow in yearly installments of $80,000

45

commencing October 1, 2003. As a result, CHS has not succeeded in raising a genuine issue of fact regarding the existence of the oral agreement. Therefore, no reasonable juror could conclude that an oral agreement existed in the face of a contradictory integrated writing on the same subject matter between the same parties and entered into after the purported oral agreement was allegedly formed. Cf. Scherer v. Kane, 284 F. App'x 850, 853 (2d Cir. 2008) (holding that parol evidence rule did not bar plaintiffs from introducing evidence to prove existence of oral contract where (i) jury could have concluded that purpose of oral agreement was not inconsistent with written agreement, (ii) jury could have credited plaintiffs' corroborative evidence in form of letter from defendant stating a term of oral agreement, and (iii) where plaintiffs and defendant were not themselves parties to written agreement).

### ii. Unlawful Purpose

CFC argues that even assuming, *arguendo*, an oral agreement between the parties existed, the agreement was made for an illegal purpose, thus rendering the contract unenforceable. (Def.'s Reply 4.)[22]

### a. Applicable Law

"Contracts for an illegal purpose or contrary to public

---

[22] Although only raised in defendant's reply, this argument is responsive to plaintiff's opposition brief. (See Pl.'s Mem. 5.)

46

policy are not enforceable." Beth Israel Med. Ctr., 448 F.3d at

580 (citing 64th Assocs., L.L.C. v. Manhattan Eye, Ear & Throat

Hosp., 2 N.Y.3d 585, 589-90, 813 N.E.2d 887 (N.Y. 2004)

("Ordinarily, courts are not involved in the oversight or

approval of contracts and will enforce them unless illegal,

against public policy or deficient in some other respect.")));

Dornberger v. Metro. Life Ins. Co., 961 F. Supp. 506,

532 (S.D.N.Y. 1997) ("Courts have long recognized that

agreements made in violation of law are unenforceable."

(citations omitted)); Hartman v. Harris, 810 F. Supp. 82,

84 (S.D.N.Y. 1992) ("It is well settled under New York law that

a contract to perform illegal acts is void and unenforceable."

(citations and footnote omitted)), aff'd 996 F.2d 301 (2d Cir.

1993). "[E]ven where a contract is not itself unlawful, the

bargain may still be illegal under New York law if it is closely

connected with an unlawful act." United States v. Bonanno

Organized Crime Family of La Cosa Nostra, 879 F.2d 20, 28 (2d

Cir. 1989) (citing Contemporary Mission, Inc. v. Bonded

Mailings, Inc., 671 F.2d 81 (2d Cir. 1982)).[23]

---

[23] Similarly, under Virginia law, an illegal contract - one with an unlawful
object forbidden by statute, common law, or public policy - is void and
unenforceable as a matter of law. See Colbert v. Ashland Constr. Co., 176 Va.
500, 11 S.E.2d 612 (1940); Massie v. Dudley, 173 Va. 42, 3 S.E.2d 176 (1939).
"[W]hen a plaintiff cannot establish his cause of action without relying upon
an illegal contract[,] he cannot recover." Colbert, 176 Va. at 506, 11 S.E.2d
at 615; accord Am. Online, Inc. v. GreatDeals.Net, 49 F. Supp. 2d 851, 864
(E.D. Va. 1999) (finding that illegal contract could not form basis for
tortious interference with contract claim).

47

### b.   Application

CHS admits in the course of briefing this motion that the sole purpose of the purported oral agreement was to evade plaintiff's tax liability to the IRS.  CHS claims that it released the funds to CFC in order to trigger the seven-day IRS notice requirement and afford the IRS an opportunity to demonstrate its entitlement to the Barnert Settlement funds was superior to CFC's claim to the funds. (Pl.'s Mem. 5, 9.) Clearly, the objective was to conceal assets from the IRS by appearing to transfer the funds outright to CFC, which had a lien superior to the IRS levy (see Def.'s Reply 5), but in actuality agreeing that CFC would later re-escrow the funds for CHS's eventual benefit. (Pl.'s Mem. 9.)  In doing so, CHS could avoid using those funds to pay its debt to the IRS.  As a matter of law, such an agreement to conceal assets and evade tax liability would be void and unenforceable under New York law. See 26 U.S.C. § 7201 ("Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony . . . ."); Sabia v. Mattituck Inlet Marina and Shipyard, Inc., 24 A.D.3d 178, 179, 805 N.Y.S.2d 346, 347 (N.Y. App. Div. 2005) (holding unenforceable a contract for purchase of boat that was falsely documented to avoid sales tax); Parpal Rest., Inc. v. Robert Martin Co., 258

48

A.D.2d 572, 573, 685 N.Y.S.2d 481, 482 (N.Y. App. Div. 1999)
(finding sublease was created for improper tax avoidance,
precluding any right of action arising from the unlawful
undertaking). The Court thus holds that CHS's claim that an
oral agreement existed between the parties is not sufficient to
withstand summary judgment.

The Court next turns to CHS's claims arising out of CFC's
retention and use of the Barnert Settlement funds. CFC contends
that it is entitled to summary judgment on CHS's unjust
enrichment and conversion claims because there was no oral
agreement to re-escrow the Barnert Settlement funds (Def.'s
Reply 5-8), and the funds were transferred outright to CFC to
partially pay CHS's lawful debts. (Def.'s Mem. 6, 11-13; Def.'s
Reply 10-14.) CFC also argues summary judgment should be
granted in its favor on CHS's fraud claim because fraud has not
been pled with sufficient particularity (id. 21), and CHS cannot
show justifiable reliance on any alleged misrepresentation.
(Def.'s Mem. 23.) Finally, CFC argues CHS's implied covenant
claims should be dismissed as a matter of law because no
contract can form the basis for these claims. (Def.'s Mem. 15.)

**B.  Conversion**

i.  Applicable Law

To establish a claim of conversion under New York law, a
plaintiff must show the "defendant exercise[d] unauthorized

49

dominion over personal property in interference with a

plaintiff's legal title or superior right of possession."

LoPresti v. Terwilliger, 126 F.3d 34, 41-42 (2d Cir. 1997)

(finding that defendant converted funds by withholding union

dues that were to be forwarded to the union pursuant to a

collective bargaining agreement and instead paying company

creditors with those monies, thus exercising control over the

monies in a manner inconsistent with the employees' right to

that property) (internal quotation marks and citation omitted).

"The tort of conversion does not require defendant's knowledge

that he [or she] is acting wrongfully, but merely an intent to

exercise dominion or control over property in a matter

inconsistent with the rights of another." Id. at 42 (internal

quotation marks and citation omitted).   "Money may be the

subject of conversion if it is specifically identifiable and

there is an obligation to return it or treat it in a particular

manner." Capital Dist. Servs., Ltd. v. Ducor Exp. Airlines,

Inc., 440 F. Supp. 2d 195, 208 (E.D.N.Y. 2006) (citing Hoffman

v. Unterberg, 9 A.D.3d 386, 388, 780 N.Y.S.2d 617 (N.Y. App.

Div. 2004), abrogated on other grounds by Tzolis v. Wolff, 10

N.Y.3d 100, 855 N.Y.S.2d 6 (N.Y. 2008)); see High View Fund,

L.P. v. Hall, 27 F. Supp. 2d 420, 429 (S.D.N.Y. 1998) ("[U]nder

New York law, an action for conversion of money will lie where

'there is a specific, identifiable fund and an obligation to

return or otherwise treat in a particular manner the specific
fund in question.'" (quoting Manufs. Hanover Trust Co. v. Chem.
Bank, 160 A.D.2d 113, 124, 559 N.Y.S.2d 704, 712 (N.Y. App. Div.
1990))).[24]

### ii. Application

Here, the Court finds as a matter of law that CHS's
conversion claim fails. CHS's conversion claim is predicated on
the allegation that CFC is withholding money that rightfully
belongs to CHS pursuant to an alleged oral agreement. Because
CHS's assertion of an oral agreement cannot withstand summary
judgment, CHS has introduced no evidence that it retained a
possessory interest in the Barnert Settlement funds susceptible
to conversion. See In re Chateaugay Corp., 10 F.3d 944, 957-58
(2d Cir. 1993) (affirming bankruptcy court's dismissal of
conversion claim premised on debtors' unlawful appropriation of
tax benefits associated with retired assets where claimant
introduced no evidence of its possessory interest in any of the
tax benefits); see also Fantozzi v. Axsys Techs., Inc., No. 07

---

[24] There is no actual conflict between the laws of New York and Virginia on
CHS's conversion claim.  Virginia law defines conversion as any distinct act
of dominion or control wrongfully exerted over the property of another,
either inconsistent with, or in denial of, the owner's superior rights.
Hairston Motor Co. v. Newsome, 253 Va. 129, 135, 480 S.E.2d 741, 744 (Va.
1997).  A plaintiff who shows conversion is entitled to recover, irrespective
of defendant's good or bad faith, care or negligence, knowledge or ignorance.
Universal C.I.T. Credit Corp. v. Kaplan, 198 Va. 67, 76, 92 S.E.2d 359, 365
(Va. 1956) (citation omitted).  "As a rule, a wronged party can recover money
converted if the possessor did not receive it in good faith or for valuable
consideration, even if the money has changed forms." Fed. Ins. Co. v. Smith,
63 F. App'x 630, 633 (4th Cir. 2003) (citing Bader v. Cent. Fid. Bank, 245
Va. 286, 427 S.E.2d 184 (Va. 1993)).

Civ. 02667, 2008 WL 4866054, at *9-10 (S.D.N.Y. Nov. 6, 2008)
(holding that plaintiff's conversion claim failed as a matter of
law because plaintiff never had ownership, possession, or
control of money, and seeking to enforce an obligation to pay is
not actionable as a conversion claim).

According to the October 28, 2002 letter from CHS's counsel
to CFC's counsel authorizing CFC's counsel to release and remit
the escrowed Barnert Settlement funds to CFC, CHS transferred
the funds outright to CFC in partial satisfaction of CFC's
claims against CHS. (Def.'s Ex. 7; Pl.'s Ex. M.)  Pursuant to
the letter, CHS imposed no obligation on CFC to escrow the funds
or otherwise treat the funds in a particular manner.
Ultimately, CFC applied the $500,000 as indicated in the letter:
against amounts loaned to CHS.  Thus, the Court finds that no
reasonable trier of fact could conclude that CFC converted
funds.  Defendant's request for summary judgment with respect to
the conversion claim is granted.

### C.   Unjust Enrichment

#### i.   Applicable Law

"'Under New York law, a plaintiff seeking an equitable
recovery based on unjust enrichment must first show that a
benefit was conferred upon the defendant, and then show that as
between the two parties enrichment of the defendant was
unjust.'" MacDraw, Inc. v. The CIT Group Equip. Fin., Inc., 157

52

F.3d 956, 963 (2d Cir. 1998) (per curiam) (citation omitted);

accord Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)

(Sotomayor, J.) ("To prevail on a claim for unjust enrichment in

New York, a plaintiff must establish 1) that the defendant

benefited; 2) at the plaintiff's expense; and 3) that 'equity

and good conscience' require restitution." (citation omitted)).

The quasi-contractual remedy of unjust enrichment is available

where a contractual relationship has failed. Berman v. Sugo LLC,

580 F. Supp. 2d 191, 210 (S.D.N.Y. 2008); see U.S. E.

Telecomms., Inc. v. U.S. W. Commc'ns Servs., 38 F.3d 1289, 1299

(2d Cir. 1994) (stating that "when two parties have bargained

with each other on the terms of an express contract but have

failed to create an enforceable contract, whether because of

failure to reach a meeting of the minds on terms or because of

noncompliance with some formal requisite of contract law," a

party may seek recovery in quasi-contract for the reasonable

value of the benefit that party conferred on the other party

(citations omitted)); Capital Dist. Servs., 440 F. Supp. 2d at

208 ("Quasi-contract is an obligation imposed by law, in the

absence of a valid and enforceable contract, because of the

conduct of the parties or some special relationship between

them, to prevent unjust enrichment."). Thus, the undisputed

existence of a valid written agreement generally bars a party

from seeking damages under an unjust enrichment theory. See,

e.g., <u>Beth Israel Med. Ctr.</u>, 448 F.3d at 586; <u>Valley Juice</u>, 87
F.3d at 610; <u>Fantozzi</u>, 2008 WL 4866054, at *10.[25]

    ii.  Application

Plaintiff contends that allowing defendant to retain the
benefit of the $500,000 settlement funds without honoring the
alleged oral agreement to re-escrow those funds for CHS's
benefit would be unjust. (Pl.'s Mem. 21.)  As a matter of law,
this Court concludes that CFC was not unjustly enriched by its
retention of the Barnert Settlement Funds.  As discussed above,
CHS's assertion of an oral agreement is insufficient to
withstand summary judgment, and therefore cannot form the basis
for its unjust enrichment claim.  Furthermore, CHS recognized in
writing "that the claim of Commerce Funding Corporation [was]
well in excess of $500,000 and wishe[d] to apply the $500,000
against that claim." (Def.'s Ex. 7; Pl.'s Ex. M.)  Not only can
CHS not maintain an unjust enrichment claim in the face of an
express written agreement clearly releasing the funds outright

---

[25] There is no actual conflict between the laws of New York and Virginia on
CHS's conversion claim.  Under Virginia law, unjust enrichment requires proof
that plaintiff conferred a benefit on defendant, and that defendant was
unjustly enriched at plaintiff's expense. See <u>Brown v. Resolution Trust
Corp.</u>, Nos. 93-2597, 94-1104, 1994 U.S. App. LEXIS 18730, at *11 (4th Cir.
July 25, 1994); <u>Kern v. Freed, Co.</u>, 224 Va. 678, 680-81, 299 S.E.2d 363, 364-
65 (Va. 1983); <u>see also Nossen v. Hoy</u>, 750 F. Supp. 740, 744-45 (E.D. Va.
1990) ("To establish a quasi-contract a plaintiff generally must show three
elements: (1) A benefit conferred on the defendant by the plaintiff; (2)
Knowledge on the part of defendant of the conferring of the benefit; and (3)
Acceptance or retention of the benefit by the defendant in circumstances that
render it inequitable for the defendant to retain the benefit without paying
for its value." (citations omitted)).  The remedy is available where the
facts indicate that the parties failed to establish any form of agreement.
<u>Nossen</u>, 750 F. Supp. at 744.

and unconditionally to CFC, but CHS's admission that the
settlement funds were insufficient to cover CHS's outstanding
debt to CFC squarely contradicts that CFC was enriched at CHS's
expense. Thus, no reasonable trier of fact could find that
CFC's retention of the funds was unjust. Defendant's request
for summary judgment with respect to the unjust enrichment claim
is granted.

## D. Fraud

### i. Applicable Law

Under New York law, the elements of a fraud claim are:
"'(1) the defendant made a material false representation,
(2) the defendant intended to defraud the plaintiff thereby,
(3) the plaintiff reasonably relied upon the representation, and
(4) the plaintiff suffered damage as a result of such
reliance.'" Manning v. Utils. Mut. Ins. Co., 254 F.3d 387, 400
(2d Cir. 2001) (quoting Bridgestone/Firestone, Inc. v. Recovery
Credit Servs., 98 F.3d 13, 19 (2d Cir. 1996)); accord Lama
Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 421, 668
N.E.2d 1370, 1373 (N.Y. 1996). Failure to fulfill a promise to
perform a future act does not give rise to a cause of action for
fraud "unless there existed an intent not to perform at the time
the promise was made." Cohen v. Koenig, 25 F.3d 1168, 1172 (2d

Cir. 1994) (Kearse, J.) (citations omitted).[26]

In addition, Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  In accordance with Rule 9(b), a claim for fraud must allege "the time, place, speaker, and sometimes even the content of the alleged misrepresentation." Ouaknine v. MacFarlane, 897 F.2d 75, 79 (2d Cir. 1990).

### ii. Application

Although it is arguable whether CHS has pled its fraud claim with sufficient particularity to satisfy Rule 9(b), the Court need not address this issue.  Even if fraud has been pled with sufficient particularity, such claim must be dismissed as a

---

[26] The Court notes that there is no actual conflict between the elements of fraud under New York and Virginia law.  "A party pursuing a cause of action for fraud in Virginia must prove by clear and convincing evidence all of the elements of fraud: (1) a false representation, (2) of material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) damages resulting from that reliance." Bank of Montreal v. Signet Bank, 193 F.3d 818, 826 (4th Cir. 1999) (citing Van Deusen v. Snead, 247 Va. 324, 441 S.E.2d 207, 209 (Va. 1994)); see A & E Supply Co., Inc. v. Nationwide Mut. Fire Ins. Co., 798 F.2d 669, 672 (4th Cir. 1986) ("Virginia law defines actual fraud as the knowing misrepresentation of a material fact to another person, whose reasonable reliance on the misrepresentation results in damage." (citing Packard Norfolk, Inc. v. Miller, 198 Va. 557, 95 S.E.2d 207, 210 (Va. 1956))).  "'[F]raud . . . cannot ordinarily be predicated on unfulfilled promises or statements as to future events.'" A & E Supply, 798 F.2d at 672 (quoting Soble v. Herman, 175 Va. 489, 9 S.E.2d 459, 464 (Va. 1940)).  However, where a person makes a promise that, when made, he does not intend to perform, that promise is a misrepresentation of present fact and is actionable as an actual fraud." Richmond Metro. Auth. v. McDevitt St. Bovis, Inc., 256 Va. 553, 559-60, 507 S.E.2d 344 (Va. 1998)).

matter of law.

First, CHS has failed to demonstrate its reliance on the
alleged misrepresentation of CFC's intent to re-escrow and
eventually return the Barnert Settlement funds to CHS.
According to its October 28, 2002 letter, CHS clearly released
the escrowed $500,000 to CFC outright and in partial
satisfaction of amounts CHS owed to CFC. (Def.'s Ex. 7; Pl.'s
Ex. M.)  The letter acknowledges that CFC's claims against CHS
were "well in excess" of the amount of escrowed funds. (Def.'s
Ex. 7; Pl.'s Ex. M.)  CFC's alleged material misrepresentation
is thus directly contradicted by the terms of CHS's written
authorization for release of the funds, which CHS itself
drafted, and which fails to include any of CFC's alleged
promises in enforceable terms. See Lazard Freres, 108 F.3d at
1543 (finding that, as a matter of law, a party's failure to
insert appropriate language for his protection into a contract
"by itself[]renders reliance on the misrepresentation
unreasonable"); Robinson v. Deutsche Bank Trust Co. Ams., 572 F.
Supp. 2d 319, 323 (S.D.N.Y. 2008) (Jones, J.) ("New York courts
have determined as a matter of law that a party's reliance was
unreasonable where the alleged misrepresentation is explicitly
contradicted by the written agreement." (citing Alter v.
Bogoricin, No. 97 Civ. 0662, 1997 WL 691332, at *9 (S.D.N.Y.
Nov. 6, 1997) (finding that plaintiff's claim that he was

fraudulently induced by pre-contractual promises was "defeated by the stark fact that it was within his power to incorporate those promises - in enforceable terms - into the . . . Agreement")))). Although reasonable reliance is largely an issue of fact, see Spencer Trask Software and Info. Servs. LLC v. RPost Int'l Ltd., 383 F. Supp. 2d 428, 452 (S.D.N.Y. 2003) (Leisure, J.), based on the evidence in the record, no reasonable trier of fact could find that CHS reasonably relied on CFC's alleged misrepresentation.

Moreover, a fraud claim based on an unlawful oral agreement "must also be dismissed, since relief cannot be granted on a tort cause of action that requires proof of the plaintiff's knowing entry into an illegal contract." Sabia, 24 A.D.3d at 179-80, 805 N.Y.S.2d at 347 (citation omitted); see Stone v. Freeman, 298 N.Y. 268, 271, 82 N.E. 2d 571, 572 (N.Y. 1948) ("It is the settled law of this State . . . that a party to an illegal contract cannot . . . plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose." (citations omitted)). Here, CFC's alleged misrepresentation of its intent to re-escrow the Barnert Settlement funds for CHS's benefit would be incidental to the illegal purpose of evading CHS's tax liability. Accordingly, CHS's cause of action alleging fraud must fail as a matter of law. Defendant's request for summary judgment with respect to

the fraud claim is granted.

## E.    Breach of Implied Covenant of Good Faith and Fair Dealing

### i.    Applicable Law

Under New York law, a covenant of good faith and fair dealing is implied in all contracts. 511 W. 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153, 773 N.E.2d 496, 500 (N.Y. 2002).[27] "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id.; see Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce, 265 A.D.2d 513, 514, 697 N.Y.S.2d 128, 130 (N.Y. App. Div. 1999) (stating that the covenant of good faith and fair dealing "is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement" (citation omitted)).  "[T]o state a cause of action alleging breach of an implied covenant of good faith and fair dealing, the plaintiff must allege facts which tend to show that the

---

[27] Generally, a breach of the implied duty of good faith and fair dealing is merely a breach of the underlying contract. Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992) (citation omitted). However, "in cases involving efforts by one party to a contract to subvert the contract itself," New York courts recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing. MacPhee v. Verizon Commc'ns Inc., No. 06 Civ. 7870, 2008 WL 162899, at *6 (S.D.N.Y. Jan. 15, 2008) (Jones, J.) (citation omitted); accord Butvin, 2001 WL 228121, at *8.

defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." Aventine, 265 A.D.2d at 514, 697 N.Y.S.2d at 128.

### ii.  Application

Here, CHS has not pointed to sufficient evidence for a reasonable trier of fact to conclude that CHS was denied the fruits of any valid contract.  First, there is ample evidence in the summary judgment record that the CHS Settlement failed.  CFC formally withdrew from the CHS Settlement, without objection from CHS, by the time it negotiated the Second Settlement.  St. Vincent's never signed the CHS Settlement on account of the IRS tax levy, which CHS has not demonstrated was actually resolved by the time the Second Settlement was negotiated.  CHS's attorney's affidavit and its principal's deposition testimony acknowledge that the CHS Settlement was never completed. (Clarke Aff. ¶ 22; Def.'s Ex. 13 at 31:7-23.)  Therefore, "drawing all inferences in plaintiff's favor, a reasonable jury could conclude that the parties never came to the 'objective meeting of the minds' required to create a binding settlement agreement, . . . or, alternatively, that even if there was a meeting of the minds, the agreement was subject to the execution of a formal agreement, which was never signed" by all parties.[28]  Larson v.

---

[28] The Court noted as much in the First Action, where this Court referred to the CHS Settlement as a "failed settlement agreement." (Def.'s 56.1 ¶ 94.)

Eney, No. 08 Civ. 3513, 2009 WL 321256, at *3 (S.D.N.Y. Feb. 10, 2009) (quoting Tractebel Energy Mktg. v. AIP Power Mktg., 487 F.3d 89, 95 (2d Cir. 2007)).  Furthermore, as discussed above, CHS's assertion that an oral agreement existed between CHS and CFC is rejected as a matter of law.  Accordingly, CHS has not – and cannot – establish any breach of the covenant of good faith and fair dealing. See Village on Canon, 920 F. Supp. at 534 (finding that, in absence of contract, there was no implied covenant to breach).  Summary judgment is therefore granted to CFC on CHS's claims for breach of this implied covenant with respect to CFC's negotiation of the Second Settlement and retention of the Barnert Settlement Funds.

### V.    Issue Adjudicated in Arbitration

CFC also argues that it is entitled to summary judgment on CHS's claim that CFC breached the covenant of good faith and fair dealing implied in the Factoring Agreement by attempting to assign back to St. Vincent's certain receivables in which CFC only had a security interest, under the terms of the Second Settlement.  This issue was litigated in arbitration arising out of the First Action.  There, the arbitrators determined that CFC's transfer back to St. Vincent's of receivables in which CFC merely possessed a security interest was void. (Pl.'s Ex. V at 3, 11-13.)  It is undisputed that, as a result of the arbitration, CHS recovered in full from St. Vincent's, including

attorneys' fees, penalties, and the invoices transferred. (See
Pl.'s 56.1 ¶¶ 95-98.)  CFC argues that CHS cannot recover again
in this action what CHS has already collected in full from St.
Vincent's. (Def.'s Reply 16-17.)[29]  This Court agrees.

## A.   Applicable Law[30]

"It is a generally recognized principle that there can be
only one recovery of damages for a single wrong or injury." Cox
v. Geary, 271 Va. 141, 147, 624 S.E.2d 16, 19 (Va. 2006)
(finding that elements of damage sought by wrongfully convicted
and incarcerated plaintiff in legal malpractice action were same
as those for which plaintiff received compensation from state
legislature, effectively barring recovery against lawyers for
those injuries and damages); accord Berman v. Johnson, No. 07-
2154, 2009 WL 567323, at *2-3 (4th Cir. Mar. 6, 2009) (per
curiam) (finding that, under Virginia law, to grant plaintiff
exclusive promotion and distribution rights in film after
plaintiff had recovered damages for defendant's complete breach
of contract that gave plaintiff promotion rights in film would
constitute double recovery because plaintiff was fully
compensated for all losses flowing from breach); Nizan v. Wells

[29] This argument, although newly raised in defendant's reply, is responsive to
plaintniff's opposition papers. (See Pl.'s 56.1 ¶ 98.)  In addition, in
granting summary judgment to defendant on this claim, the Court does not
address defendant's arguments that the attempted sale of receivables to St.
Vincent's was commercially reasonable.

[30] As discussed above, because this implied covenant claim is a contractual
cause of action, it falls within the scope of the contractual choice-of-law
provision, and the Court will apply Virginia law.

Fargo Bank Minn. Nat'l Ass'n, 274 Va. 481, 492-94 650 S.E.2d
497, 502-04 (Va. 2007) (finding that, where plaintiff alleged
that damages defendant recovered from assignor for inflated
purchase price of defaulted note were of the same character as
payment sought from plaintiff as guarantor of the note, such
factual representations, if true, would present a prima facie
claim of double recovery).  This proposition is rooted in "basic
principles of fairness and justice." Nizan, 274 Va. at 491, 650
S.E.2d at 502 (quoting Katzenberger v. Bryan, 206 Va. 78, 85,
141 S.E.2d 671, 676 (Va. 1965)) (internal quotation marks
omitted).

### B.   Application

CHS attempts to recast in this action the same injuries and
damages CHS sustained as results of the void transfer of
receivables to St. Vincent's, and for which the arbitration
award against St. Vincent's fully compensated CHS.  Because CHS
is only entitled to one recovery for those injuries and damages,
see Cox, 271 Va. at 147-48, 624 S.E.2d at 19, CHS cannot recover
again from CFC under the theory of breach of the implied
covenant of good faith and fair dealing.  Defendant's request
for summary judgment on this implied covenant claim is granted.

## Conclusion

For the foregoing reasons, defendant's motion for summary judgment is DENIED with respect to liability on plaintiff's breach of contract claim, and GRANTED with respect to all other claims.  The parties shall appear for a pre-trial conference before this Court on May  7, 2009 at 10:00 a.m.

**SO ORDERED.**

**New York, New York**
April *6* , 2009

U.S.D.J.